NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

AMPEX CORPORATION, Respondent.

No. 18181.

United States Court of Appeals, Seventh Circuit.

April 22, 1971.

**83**

Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Stephen Solomon, Paul J. Spielberg, Donald P. Miller, Attys., N.L.R.B., Washington, D. C., for petitioner.

McDermott, Will & Emery, Gerald S. Patterson, Harry Sangerman, Chicago, Ill., for respondent.

Before FAIRCHILD, CUMMINGS, and PELL, Circuit Judges.

FAIRCHILD, Circuit Judge.

The NLRB found that Ampex Corporation engaged in an 8(a)(2) unfair labor practice by dominating and interfering with the administration of a labor organization and contributing support to it, and 8(a)(3) and 8(a)(1) unfair labor practices by discharging Betten to discourage union membership and discharging Earnest and Ebel to discourage both union membership and other participation in concerted activities for mutual aid or protection.

The board adopted the trial examiner's decision and recommendations after making certain modifications and corrections.[1] Portions of the decision relate to charges which were dismissed and need not be reviewed. As to the parts under review, Ampex challenges certain inferences and legal conclusions, but not the recitation of the basic facts. We deem it unnecessary to restate them here.

1. *Communications Committee as a labor organization dominated and supported by the employer.*

Ampex emphasizes the undisputed facts that the committee had no formal organization structure, that employees who were to attend a meeting were chosen at random from among groups of employees, that participation was rotated so that ordinarily no employee participated a second time until all others in his group had participated, that there was a separate grievance procedure in which the committee was not involved, and that the matters discussed at committee meetings ranged widely be-

yond the subjects concerning which employers and labor organizations ordinarily deal. Ampex likens the committee mechanism to a suggestion box, made less impersonal, and suggests that it was a channel of communication and a means of bringing "the monolithic corporation into relevant contact with its people."

We might well be persuaded that this particular mechanism was not a labor organization in the ordinary sense of the term. The statutory definition, however, is very broad. It reaches "any * * * plan, in which employees participate and which exists for the purpose, * * * in part, of dealing with employers concerning grievances, * * * wages, rates of pay, hours of employment, or conditions of work."[2]

The statute has been broadly construed, both with respect to absence of formal organization[3] and the type of interchange between the parties which may be deemed "dealing."[4]

There was ample evidence that the committee meetings often involved matters in some of the fields referred to in the statutory definition and resulted in action upon them by management. The inference, drawn by the examiner and the board, that this "dealing" was part of the purpose of the committee mechanism was reasonable.

Ampex next challenges the finding that it dominated, interfered with and contributed support to the committee.

It would be very difficult, however, to find that Ampex did not dominate and contribute support to the committee. Everything necessary for its functioning was done by management except for the attendance of employees selected for each meeting by the system devised by

---

1. 168 N.L.R.B. No. 96.

2. 29 U.S.C. § 152(5). The entire definition reads: "The term 'labor organization' means any organization of any kind, or any agency or employee representation committee or plan, in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work."

3. Pacemaker Corp. v. National Labor Relations Board (7th Cir., 1958), 260 F.2d 880, 883.

4. N.L.R.B. v. Cabot Carbon Co. (1959), 360 U.S. 203, 213, 79 S.Ct. 1015, 3 L. Ed.2d 1175.

management. There is nothing in the record to suggest that the procedure would continue if it were left up to the employees.

Of course the committee mechanism was first set up more than six months before the charge was filed, so that the separate act of formation could no longer be proceeded against as an unfair labor practice. The fact that management wholly created it, however, may properly be considered to the extent that fact sheds light on whether it had any independence of management during the limitations period.[5] During the limitations period management decided when a meeting would be held. The committee had no function other than the meetings, there was no continuity in membership from meeting to meeting, and the employees who were to attend were selected by the procedure prescribed by management. Management presided and took notes for the minutes. There is no evidence of any employee initiative at work either in originally creating or in continuing the procedure.

Ampex relies on decisions holding that provision by the employer of various types of clerical assistance and other conveniences to particular labor organizations was mere cooperation which did not amount to domination or support. We have examined these cases and find that the organization involved in each had some reasonable claim to being an independent entity composed of employees and distinct from management. Not so here, and we deem the cases inapplicable.[6]

2. *Rejection of employer's offer of partial settlement.*

The complaint alleged that the discharges of Earnest, Ebel, and Betten in July and of four other employees August 19 were discriminatory and unfair labor practices. It also charged the 8(a) (2) unfair labor practice just discussed.

Ampex made a motion before the trial examiner that the Earnest, Ebel, and Betten charges be dismissed because Ampex had offered to settle those three and the General Counsel had rejected the offer. Such dismissal is said to be appropriate in order to implement a provision of the administrative procedure act requiring an agency to give an opportunity for submission and consideration of offers of settlement.[7]

It appears that counsel for all parties had discussed settlement before the hearing. Ampex offered settlements with respect to the charges concerning Earnest, Ebel, and Betten, including reinstatement and full back pay, but, presumably, not including entry of a cease and desist order. General Counsel was willing to settle the entire case on the basis of offers of reinstatement and back pay for all seven, and withdrawal of the 8(a) (2) charge, as consented to by the charging party.

We do not think the administrative procedure act requires consideration by the examiner or the board of an offer of settlement in an unfair labor practice proceeding. 29 U.S.C. § 153(d) gives the General Counsel final authority on behalf of the board in respect to the prosecution of complaints before the board. The independent authority thus given him is substantial.[8] On this

5. Local No. 1424, Internat. Machinists v. N.L.R.B. (1960), 362 U.S. 411, 416, 80 S.Ct. 822, 4 L.Ed.2d 832.

6. Modern Plastics Corporation v. N.L. R.B. (6th Cir., 1967), 379 F.2d 201; Federal-Mogul Corp., Coldwater Dist. Ctr. Div. v. N.L.R.B. (6th Cir., 1968), 394 F.2d 915; Chicago Rawhide Mfg. Co. v. Natl. Labor Rel. Bd. (7th Cir., 1955), 221 F.2d 165; Hotpoint Co. v. N.L.R.B. (7th Cir., 1961), 289 F.2d 683;

N.L.R.B. v. Newman-Green Inc. (7th Cir., 1968), 401 F.2d 1, 4; Wayside Press v. National Labor Relations Board (9th Cir., 1953), 206 F.2d 862.

7. 5 U.S.C. § 554(c).

8. International Union of Elec., Radio, etc. v. N.L.R.B. (1960), 110 U.S.App.D.C. 91, 289 F.2d 757, 761; Division 1267, Amal. Ass'n of Street, El. Ry., etc., Emp.

record Ampex was given an opportunity for submission and consideration of its partial offer of settlement by trial counsel for the General Counsel, and in our opinion the requirement of the administrative procedure act relied on was fulfilled.

■ In the colloquy before the trial examiner, counsel for General Counsel gave as a reason for refusing to settle the three cases that he would then be unable to use evidence about those three discharges to help prove the discriminatory character of the other four. Although it may be true, as now argued by Ampex, that counsel was mistaken about the limitations he would be under, Ampex trial counsel did not at the time suggest willingness that the proof be so used, and we do not view the rejection of the offer as arbitrary, even if based on a mistaken view of the law.

Ampex relies on Michigan Consolidated Gas Co. v. Federal Power Comm'n (1960), 108 U.S.App.D.C. 409, 283 F.2d 204. *Michigan, Consolidated* involved an apparently complex question concerning fulfillment of requirements of natural gas service in the public interest. The commission had refused to consider a settlement proposal of considerable complexity which the court found promised to fulfill the commission's announced objective better than the course ordered by the commission. The court directed that on remand the proposal must be considered, but did not require that it be accepted. We do not consider *Michigan Consolidated* apposite here.

3. *Antiunion motivation for discharge.*

■ Because of the position of Ampex, discussed in part 2, above, Ampex offered no proof in answer to the claims concerning the Earnest, Ebel, and Betten discharges. Ampex argues here that there is no evidence that management

had knowledge of the union activities of those employees and hence no evidence of an antiunion motivation for their discharges. There was some evidence that Betten had discussed union matters in proximity to a foreman who was watching him. Other direct evidence that interest in the union was made known to management was indeed slight. We conclude, however, that such knowledge could be properly inferred from all the circumstances, including timing, the irrational motivation to which the discharges must be attributed if the motivation was not antiunion, the references to the discharges as getting rid of the troublemakers, and the peculiarities of the procedures used, all as detailed in the trial examiner's decision. In Betten's case, moreover, a supervisor predicted Betten would be fired, set up a situation where Betten would be likely to give a colorable excuse, and followed through.

4. *Concerted activities of Earnest and Ebel.*

■ The board found that in discharging Earnest and Ebel, Ampex not only sought to discourage union membership, but also to discourage participation in concerted activities for mutual aid or protection. They acted together at the various stages of their quest for reclassification. Ampex would treat their activity as individual efforts, only fortuitously simultaneous. We think the board could properly find it joint and mutual.

5. *Overbreadth of order.*

■ The board's order, in subparagraphs 1(a), (b), and (c) requires Ampex to cease and desist from practices corresponding to the unfair labor practices found. Ampex objects to the catchall subparagraph (1) (d) "In any other manner interfering with, restraining, or coercing its employees in the ex-

v. Ordman (1963), 116 U.S.App.D.C. 7, 320 F.2d 729; Frito Company, Western

Division v. N.L.R.B. (9th Cir., 1964), 330 F.2d 458, 464.

ercise of the rights guaranteed in Section 7 of the Act." The point is valid.[9]

The board's order will be modified by deleting subparagraph (1) (d) and as so modified will be enforced. The board is allowed its costs on appeal.

9. N.L.R.B. v. Express Pub. Co. (1941), 312 U.S. 426, 433, 61 S.Ct. 693, 85 L.Ed. 930; N.L.R.B. v. Thompson Ramo Wooldridge, Inc. (7th Cir., 1962), 305 F.2d 807, 810.