**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**TAYKO INDUSTRIES, INC., Respondent.**

**No. 75–1147.**

United States Court of Appeals, Ninth Circuit.

Oct. 29, 1976.

William Stewart, Atty. (argued), of NLRB, Washington, D. C., for petitioner.

J. Mark Montobbio (argued), of Severson, Werson, Berke & Melchoir, San Francisco, Cal., for respondent.

Before TRASK, GOODWIN and WALLACE, Circuit Judges.

TRASK, Circuit Judge:

Upon charges filed by Automotive Teamsters and Chauffeurs Local 165 that Tayko Industries, Inc. (Tayko) had engaged in unfair labor practices within the meaning of section 8(a)(1) and (3) of the National Labor Relations Act (NLRA), 29 U.S.C. § 158(a)(1) and (3), a hearing was held and the charges sustained. The order of the Administrative Law Judge (ALJ) was affirmed by a three-member panel of the National Labor Relations Board (Board) in 214 NLRB No. 19 and was directed to be enforced. The matter is before this court upon application of the Board for enforcement of its order.

## I.

During September and October 1973, the period under consideration, the principal office of Tayko was located at Elder Creek, California, while its production facility was located at Rancho Cordova, California, about six miles away. Company president, John Taylor, officed at Elder Creek, while production manager, Ken White, was in charge at Rancho Cordova. White spent six to seven hours each day in the production area in direct supervision of employees. The company employed a number of disadvantaged employees and absenteeism and tardiness were common throughout the plant.

About 30 to 35 employees were in the production area at Rancho Cordova. The building was a large undivided concrete warehouse with a small office partitioned off in one corner of the building. Two large windows were in the office, one facing the electrical section and the other facing the assembly section. The work of the facility was primarily the inspection and repair of government-owned diesel generators. In the assembly section there were four employees, Enix, Maes, Hesse, and Hollingsworth, the latter being the junior in seniority.

During September 1973, Enix, Maes, and Hesse began to talk among themselves about union representation. Maes visited the business representative of the local Teamsters Union and obtained a supply of authorization cards for distribution among Rancho Cordova employees.[1] After a successful response to the distribution, a meeting was arranged in the Labor Temple and about 20 of the production employees attended. The evidence was to the effect that both the distribution and solicitation of authorization cards and the arrangements for the meeting were carried out openly around the plant during work and break time with no attempt to conceal the activity. The meeting took place on September 20. On September 21, as the employees left work for the day, Maes, Enix, and Hesse were handed dismissal letters either personally or to a friend for delivery. Two of them stated as reasons "excessive absences

---

1. Maes originally contacted the representative of Local 150; it was later determined that the employees would be better represented by Automotive Teamsters & Chauffeurs Local 165, International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of America. Local 165 became the charging party here.

and tardiness," and a third letter stated "a lack of work on contract" as the reason.

At the time of the discharge the record of the two who were discharged for absence or tardiness was "no better or worse than some of the other individuals we had" according to the testimony of manager White. On September 25, the union filed a petition with the Board for an election. At noon that day the company laid off all its employees and closed the plant. About two weeks later it began to recall some employees, and between October 9 and October 16, the company recalled 16 employees giving a wage increase to 14 of the 16. Maes was one of those rehired. At least seven of the employees rehired and given raises were within the bargaining unit, and the raises were given when Tayko had full knowledge of the pending election petition.

## II.

Upon the facts developed at the hearing, the Administrative Law Judge determined that the company had violated section 8(a)(1) of the NLRA by granting a pay raise to certain employees during the pendency of an election petition, and had violated section 8(a)(3) by terminating the employment of employees Maes, Enix, and Hesse because of their union activities.

Looking first to the section 8(a)(1) claim, 29 U.S.C. § 158(a)(1) provides:

"It shall be an unfair labor practice for an employer—

(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;"

Section 157 guarantees to employees the right of self-organization, collective bargaining, etc.

On October 25 the company laid off all of its Rancho Cordova employees, and at noon on that day shut down its plant.[2] It remained closed for about two weeks. At the end of that period the president and managerial staff decided to resume operations with fewer employees. President Taylor thereupon authorized production manager White to call employees to return to work. Some were offered increases but with increased responsibilities; others were offered the same wage, and of these some accepted and some refused. The Administrative Law Judge from a stipulated exhibit of rehirings determined that seven employees were rehired and granted increases at a time when the employer had full knowledge of a pending election petition for union representation and with no showing of increased duties. He declared:

"In the absence of some showing that these employees would not have returned to work without an increase in wages and in the absence of any showing that these increases were granted in conformance with an established policy, it is well-established that under such circumstances the granting of wage increases is a violation of Section 8(a)(1) of the Act, and I so find. Had Respondent called these employees to testify and each of them had testified that he would not have returned to work for Respondent without an increase in wages, I would feel compelled to dismiss this allegation of the complaint."

President Taylor acknowledged that at the time he authorized rehiring and increased wages he was aware of a pending election on union representation. Although he also testified that this knowledge "did not enter" into the wage increases, those increases could not avoid having an influence upon the pending election. As such, the increases interfered with the employees' free choice of a bargaining representative. *NLRB v. Parts Co.*, 375 U.S. 405, 409, 84 S.Ct. 457, 11 L.Ed.2d 435 (1964); *William P. Owen d/b/a Owen's IGA Foodliner*, 188 NLRB 277. In the *Owens* case, the employer had not made any anti-union statements or threats to his own employees. Nevertheless, he testified that he had said to them,

---

2. The employer asserts in its brief and asserted at the hearing that a charge that the shutdown was illegal, was dismissed by the NLRB Regional Office. There is no evidence in the record to the contrary, and the brief on behalf of the Board does not dispute that assertion. Therefore, we assume it to be fact.

"I wish we could negotiate together instead of going through a union, but that is up to them." *Id.* at 278. Despite his more or less neutral language, the Board upheld the findings that

"[b]y continuing to offer improvements in wages and working conditions and by implementing improvements in wages and working conditions after notice of the pendency of union activity, Respondent violated Section 8(a)(1) of the Act. *National Labor Relations Board v. Exchange Parts Co.* (1964)." *Id.*

*See also NLRB v. Gruber's Super Market, Inc.,* 501 F.2d 697, 702 (7th Cir. 1974); *Owens-Corning Fiberglas Corp. v. NLRB,* 407 F.2d 1357, 1360 (4th Cir. 1969). Here, despite the denials of anti-union intentions by Taylor, we cannot say that under the circumstances the conclusion of the Administrative Law Judge was unjustified or that on the record as a whole there is not substantial evidence to support the findings. *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 490–91, 71 S.Ct. 456, 95 L.Ed. 456 (1951).

### III.

The other unfair labor practice charged and found to exist was the termination of Maes, Enix, and Hesse because of their union activities in violation of section 8(a)(3). Title 29 U.S.C. § 158(a)(3) provides:

"It shall be an unfair labor practice for an employer—

.    .    .    .    .

"(3) by discrimination in regard to hire or tenure of employment  .  .  . to encourage or discourage membership in any labor organization  .  . .."

As to these discharges, one is struck after combing the findings and analysis of the evidence by the Administrative Law Judge by the lack of direct evidence of a credible nature that the employer had any knowledge of union activity when he discharged the three men. Rosales, who gave some testimony of management awareness, though weakly, was thoroughly impeached by his own affidavit to a Board agent. The

Administrative Law Judge frankly stated, "Rosales is not to be credited." Another employee, Elliott, testified to overhearing a conversation between a management official and a company contract coordinator that did not directly refer to an employee-union problem but could have been interpreted that way. The Administrative Law Judge found that it could just as easily have been interpreted to refer to other matters and therefore was "totally inadequate" to prove employer knowledge of union activity. The stated reasons in the discharge notices were tardiness, absenteeism, and a poor production record.

The Administrative Law Judge finally resorted for his prima facie case to inferences drawn from circumstantial evidence. The first union contact was made by one of the discharged employees on September 18, and the authorization cards were obtained on September 19. Both of these events took place away from the plant. There was some distribution of the cards during work and a meeting held at the union hall the night of the 20th. Additional cards were solicited during the 21st, and the three men were fired on the 21st. From this evidence, the Administrative Law Judge concluded:

"Because of the timing, the relatively small work force in an open area, the on-the-job solicitation, the opportunity management had to observe the activity, and the particular employees selected for discharge, I find the General Counsel has proven a *prima facie* case."

The employer's story, which the Administrative Law Judge discredited and found pretextual, was that because of production problems and the pressure by president Taylor (away at the time) to either correct them or heads would fall, production manager White and vice-president Guiffreda felt compelled to make changes. The assembly area was selected because it seemed to be the bottleneck in production. Whereas normally 20 units were completed per month, by September 21, only six units had been finished. President Taylor, whose testimony was credited, said that he had no knowledge of union activity or organization prob-

lems until several days after the discharges were made. It is difficult to believe that he would have been ignorant of them had production manager White or vice-president Guiffreda been motivated by anti-union animus. They were in touch with Taylor by telephone on September 18.

■ The burden is upon the Board to prove that the discharges were illegally motivated. *NLRB v. Klaue*, 523 F.2d 410, 413 (9th Cir. 1975). The employer may terminate an employee for no reason or any reason other than union or other protected activity. *Amalgamated Meat Cutters Local No. 364 v. NLRB*, 435 F.2d 668, 671 (9th Cir. 1970). Production manager White, vice-president Guiffreda, and president Taylor each denied categorically any knowledge of union activity at the time of or prior to the job terminations. Although the Administrative Law Judge stated that the lack of production reason was pretextual, the record shows that there was a lack of production, that it caused the shut-down, and that these events and conditions occurred at the same time. The conclusion that the terminations were motivated for anti-union reasons, of which there was no evidence, and not lack of production, of which there was abundant evidence, cannot be called reasonable or substantial on the record considered as a whole.

■ We therefore hold that the wage increases, given at a time when an election proceeding was pending, constituted a violation of section 8(a)(1), but that the job terminations were not shown by substantial evidence on the record as a whole to have been motivated or caused by anti-union reasons or by discrimination in violation of section 8(a)(1) or (3) of the Act as charged.

The order is enforced except as to the portion thereof which is based upon the alleged unlawful discharge of John Maes, Harlan Enix, and Norman Hesse; as to that portion which includes reinstatement and payment of back earnings and accompanying notices, we deny enforcement.