[Civ. No. 21097. Fourth Dist., Div. Two. Oct. 21, 1980.]

GEORGE ARAKELIAN FARMS, INC., Petitioner, v.
AGRICULTURAL LABOR RELATIONS BOARD, Respondent;
UNITED FARM WORKERS OF AMERICA, AFL-CIO,
Real Party in Interest.

COUNSEL

Dressler, Stoll & Jacobs, Dressler, Stoll, Quesenbery, Laws & Barsamian, Marion I. Quesenbery and Laurie A. Laws for Petitioner.

Marvin J. Brenner, William B. Eley, Ellen Lake, Daniel G. Stone and Manuel M. Medeiros for Respondent.

Marco E. Lopez, Carlos M. Alcala, Francis E. Fernandez, Carmen S. Flores, Jerome Cohen, Tom Dalzell, Sanford N. Nathan, Dianna Lyons, Daniel A. Garcia, Federico G. Chavez and Ellen J. Eggers for Real Party in Interest.

OPINION

**KAUFMAN, J.**—George Arakelian Farms, Inc. (Arakelian or petitioner) seeks statutory review (Lab. Code, § 1160.8) of a decision of the

Agricultural Labor Relations Board (ALRB or Board) determining that petitioner committed three unfair labor practices and of Board's order based thereon. (All statutory references will be to the Labor Code unless otherwise specified.)

Arakelian is an agricultural employer (§ 1140.4, subd. (c)) subject to the Agricultural Labor Relations Act (§ 1140 et seq. [hereafter ALRA]). It is a California corporation engaged in the growing, harvesting and marketing of flat and row crops such as alfalfa, cotton, cantaloupes and lettuce in portions of both Riverside and Imperial Counties. At peak it employs over 150 workers. George Arakelian is the president of the corporation.

On charges filed by United Farm Workers of America, AFL-CIO (UFW), a labor organization within the meaning of subdivision (f) of section 1140.4, ALRB's general counsel issued a complaint accusing petitioner of eight acts allegedly constituting unfair labor practices. Arakelian filed an answer in essence denying the charges. The case was heard by an administrative law officer (ALO) between November 29 and December 8, 1977, in Blythe. The ALO determined that petitioner had committed only one of the eight charged unfair labor practices, the discriminatory discharge of a cantaloupe harvesting crew for engaging in concerted activities.

The ALO's proposed order would have required petitioner to: (1) cease and desist from in any manner interfering with, restraining or coercing employees in the exercise of their rights under section 1152 of the ALRA; (2) cease and desist from discriminating in regard to the hiring or tenure of employment, or any term or condition of employment to encourage or discourage membership in any labor organization; (3) make whole all those members of the Gilberto Pena cantaloupe harvesting crew for any losses in pay they may have suffered as a result of petitioner's termination of said crew; and (4) post and read to employees during the 1978 peak period of employment a notice informing the employees of their rights under the ALRA.

All parties filed exceptions to the ALO's recommended decision and proposed order. On the basis of the existing record, on February 14, 1979, Board issued its final decision and order which are the subjects of this review.

The Board adopted the findings and affirmed the conclusions of the ALO that petitioner committed an unfair labor practice in discriminatorily discharging the cantaloupe harvesting crew. However, contrary to the ALO's findings and recommended decision, the Board also determined that petitioner had committed two other unfair labor practices: (1) discriminatorily assigning employee Menesis to do more arduous work than was customary and (2) discriminatorily laying off six irrigators and shovelers. Board modified the ALO's proposed order accordingly and ordered petitioner to take, in addition to that proposed by the ALO, the following affirmative action: (1) offer to reinstate the six irrigators and shovelers laid off in September 1977 and make them whole for any losses in pay and other economic losses they may have suffered as a result of the lay-off; and (2) post and read to the employees during the 1979 peak employment period the ALRB's notice of employee rights under the ALRA.

Arakelian contends that none of the three unfair labor practices found by the Board are supported by substantial evidence on the whole record. It further contends that even if the Board's determination that it committed one or more of these unfair labor practices is supported by substantial evidence, Board's order is punitive, arbitrary and capricious.

*Scope of Review*

Inasmuch as insufficiency of the evidence is claimed with respect to all three of the unfair labor practices found by the Board, we discuss the law pertaining to the scope of review at the outset.

■ The standard is whether the Board's findings are supported by substantial evidence on the record considered as a whole. (§ 1160.8; *Tex-Cal Land Management, Inc.* v. *Agricultural Labor Relations Bd.* (1979) 24 Cal.3d 335, 349 [156 Cal.Rptr. 1, 595 P.2d 579]; *Sunnyside Nurseries, Inc.* v. *Agricultural Labor Relations Bd.* (1979) 93 Cal. App.3d 922, 930-931 [156 Cal.Rptr. 152].) The language in section 1160.8 prescribing the standard of review was taken verbatim from the corresponding section of the National Labor Relations Act (29 U.S.C. § 160(f)), and federal decisions under the federal statute are of precedential value in fleshing out the parameters of the standard. (*Sunnyside Nurseries, Inc.* v. *Agricultural Labor Relations Bd., supra*; see also *Belridge Farms* v. *Agricultural Labor Relations Bd.* (1978) 21 Cal.3d 551, 557 [147 Cal.Rptr. 165, 580 P.2d 665].)

The leading federal decision discussing the "substantial evidence on the record considered as a whole" standard of review is *Universal Camera Corp.* v. *Labor Bd.* (1951) 340 U.S. 474 [95 L.Ed. 456, 71 S.Ct. 456] in which the history of section 10(f) of the NLRA, the demands for more extensive judicial review of NLRB decisions and the consequent amendment of NLRA to provide for such review are thoroughly discussed.[1] The court stated: "Whether or not it was ever permissible for courts to determine the substantiality of evidence supporting a Labor Board decision merely on the basis of evidence which in and of itself justified it, without taking into account contradictory evidence or evidence from which conflicting inferences could be drawn, the new legislation definitely precludes such a theory of review and bars its practice. The substantiality of evidence must take into account whatever in the record fairly detracts from its weight. This is clearly the significance of the requirement in both statutes that courts consider the whole record.... [¶] To be sure, the requirement for canvassing 'the whole record' in order to ascertain substantiality does not furnish a calculus of value by which a reviewing court can assess the evidence. Nor was it intended to negative the function of the Labor Board as one of those agencies presumably equipped or informed by experience to deal with a specialized field of knowledge, whose findings within that field carry the authority of an expertness which courts do not possess and therefore must respect. Nor does it mean that even as to matters not requiring expertise a court may displace the Board's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo*. Congress has merely made it clear that a reviewing court is not barred from setting aside a Board decision when it cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the Board's view." (340 U.S. at pp. 487-488 [95 L.Ed. at pp. 467-468].)

---

[1]The original Wagner Act provided: "The findings of the Board as to the facts, if supported by evidence, shall be conclusive." This standard of review was subject to varying interpretations. Eventually, however, many decisions, including several of the United States Supreme Court, employed the "any evidence" standard. (See *Universal Camera Corp.* v. *Labor Bd., supra*, 340 U.S. at pp. 477-478 [95 L.Ed. at p. 462].) "Criticism of so contracted a reviewing power reinforced dissatisfaction felt in various quarters with the Board's administration of the Wagner Act.... The scheme of the Act was attacked as an inherently unfair fusion of the functions of prosecutor and judge. Accusations of partisan bias were not wanting. The 'irresponsible admission and weighing of hearsay, opinion, and emotional speculation in place of factual evidence' was said to be a 'serious menace.'" (*Id.*, fns. omitted.) This led to the 1947 amendment setting forth the present "substantial evidence on the record considered as a whole" language.

Although it recognized the futility of attempting to articulate with precision the standard to be employed by the reviewing courts, the Supreme Court stated: "The legislative history of these Acts demonstrates a purpose to impose on courts a responsibility which has not always been recognized.... [¶] We conclude, therefore, that...courts must now assume more responsibility for the reasonableness and fairness of Labor Board decisions than some courts have shown in the past. Reviewing courts must be influenced by a feeling that they are not to abdicate the conventional judicial function. Congress has imposed on them responsibility for assuring that the Board keeps within reasonable grounds. That responsibility is not less real because it is limited to enforcing the requirement that evidence appear substantial when viewed, on the record as a whole, by courts invested with the authority and enjoying the prestige of the Courts of Appeals. The Board's findings are entitled to respect; but they must nonetheless be set aside when the record before a Court of Appeals clearly precludes the Board's decision from being justified by a fair estimate of the worth of the testimony of witnesses or its informed judgment on matters within its special competence or both." (*Universal Camera Corp.* v. *Labor Bd.,* supra, 340 U.S. at pp. 489-490 [95 L.Ed. at pp. 468]; accord: *Sunnyside Nurseries, Inc.* v. *Agricultural Labor Relations Bd.,* supra, 93 Cal.App.3d at pp. 930-931.)

As noted by the Supreme Court in *Tex-Cal Land Management, Inc.* v. *Agricultural Labor Relations Bd.,* supra, 24 Cal.3d at page 349, the standard of review prescribed by section 1160.8 is exactly the same as that provided with respect to the review of workers' compensation proceedings in Labor Code section 5952 as explicated in *LeVesque* v. *Workmen's Comp. App. Bd.* (1980) 1 Cal.3d 627, 637 [83 Cal.Rptr. 208, 463 P.2d 432]; *Lamb* v. *Workmen's Comp. Appeals Bd.* (1974) 11 Cal.3d 274, 280-281 [113 Cal.Rptr. 162, 520 P.2d 978]; *Garza* v. *Workmen's Comp. App. Bd.* (1970) 3 Cal.3d 312, 317 [90 Cal.Rptr. 355, 475 P.2d 451]. (See also *Hurwitz* v. *Workers' Comp. Appeals Bd.* (1979) 97 Cal.App.3d 854, 861, fn. 3 [158 Cal.Rptr. 914]; *Steve P. Rados, Inc.* v. *California Occupational Saf. & Health Appeals Bd.* (1979) 89 Cal.App.3d 590, 594-595 [152 Cal.Rptr. 510].) These cases establish the "substantial evidence on the whole record" standard is not met "by simply isolating evidence which supports the board and ignoring other relevant facts of record which rebut or explain that evidence." (*Garza* v. *Workmen's Comp. App. Bd.,* supra.)

With respect to two of the unfair labor practice charges the Board found petitioner committed, the Board's findings, where such there are, and its determinations are contrary to the findings and determinations of the ALO. This brings into question the weight and effect, if any, to be given to the hearing officer's findings and determinations.

This problem, too, was considered in *Universal Camera* which held the findings of the hearing officer may be considered by the reviewing court in its determination whether the Board's determination is supported by substantial evidence on the record considered as a whole. The court said: "We do not require that the examiner's findings be given more weight than in reason and in the light of judicial experience they deserve. The 'substantial evidence' standard is not modified in any way when the Board and its examiner disagree. We intend only to recognize that *evidence supporting a conclusion may be less substantial when an impartial, experienced examiner who has observed the witnesses and lived with the case has drawn conclusions different from the Board's than when he has reached the same conclusion.* The findings of the examiner are to be considered along with the consistency and inherent probability of testimony. The significance of his report, of course, depends largely on the importance of credibility in the particular case." (340 U.S. at p. 496 [95 L.Ed. at p. 472]; accord: *N. L. R. B.* v. *Best Products Co., Inc.* (9th Cir. 1980) 618 F.2d 70, 73; *Butler-Johnson Corp* v. *N. L. R. B.* (9th Cir. 1979) 608 F.2d 1303, 1305.)

In response to *Universal Camera*, the federal courts have stated that, "the . . . supporting evidence, in cases where [the Board] rejects the examiner's findings, must be stronger than would be required in cases where the findings are accepted, since in the former cases the supporting evidence must be deemed substantial when measured against the examiner's contrary findings as well as the opposing evidence." (*N. L. R. B.* v. *Interboro Contractors, Inc.* (2d Cir. 1967) 388 F.2d 495, 499; see also *Penasquitos Village, Inc.* v. *N. L. R. B.* (9th Cir. 1977) 565 F.2d 1074, 1078.)

The federal rule constitutes a significant check on the possibility of arbitrary administrative action, the importance of which has been most recently noted by the California Supreme Court in *J. R. Norton Co.* v. *Agricultural Labor Relations Bd.* (1979) 26 Cal.3d 1, 33 [160 Cal. Rptr. 710, 603 P.2d 1306]. The rule appears to us to be sound and fully consistent with the ALRA which provides that the recommended order of an ALO shall become the order of the Board 20 days after service

upon the parties if no exception is filed thereto. (§ 1160.3.) The rule is also consonant with the precepts of the ALRB itself which has promulgated a regulation that provides: "Where one or more parties take exception to the decision of the administrative law officer, the Board shall review the applicable law and the evidence and determine *whether the factual findings are supported by a preponderance of the evidence taken.*" (Cal. Admin. Code, tit. 8, § 20286(b); italics added.)[2]

With these principles concerning the proper scope of review in mind, we turn to the three unfair labor practices found by the Board.

### The Menesis Incident—Discriminatory Work Assignment

Jose Luis Menesis had experience as an irrigator for over 17 years and worked for petitioner for 4 years between 1972 and 1976. After a hiatus of approximately a year, Menesis was reemployed by petitioner in January 1977. During Menesis' absence from petitioner's ranch, the UFW had organized and won a representation election among Arakelian employees on December 15, 1976. Even though Menesis was not present for the union campaign and election, he supported the union and there is some evidence that his supervisor, Diego Loureiro, knew of his union sympathies.

Sometime in February 1977, a month after Menesis had been rehired by petitioner, supervisor Loureiro sent Menesis and another employee for assignment to a field served by three irrigation ditches. Menesis was assigned to control two irrigation ditches while the other employee was responsible for the remaining ditch. Loureiro checked both men's work later in the morning and gave instructions that the water be switched to fields on the other side of the ditches. He left instructions that Menesis should go home at 1 or 2 in the afternoon when everything was in order, and that he was to return on Monday for an additional assignment unless called on Sunday to help irrigate. The other employee was to stay with the field for the remainder of the afternoon and watch the water.

[2]We also note as having some bearing on this issue recent decisions of the Supreme Court and Courts of Appeal holding that, at least with respect to some factual questions, "[w]hen a referee's finding...is supported by solid credible evidence, it is to be accorded great weight by the Board and should be rejected only on the basis of contrary evidence of considerable substantiality." (*Lamb* v. *Workmen's Comp. Appeals Bd., supra,* 11 Cal.3d at p. 281; *Garza* v. *Workmen's Comp. App. Bd., supra,* 3 Cal.3d at pp. 318-319; *Robert G. Beloud, Inc.* v. *Workers' Comp. Appeals Bd.* (1975) 50 Cal. App.3d 729, 737 [123 Cal.Rptr. 750]; *Greenberg* v. *Workmen's Comp. Appeals Bd.* (1972) 37 Cal.App.3d 792, 799 [112 Cal.Rptr. 626].)

Menesis left at about 1:30 that afternoon and did not thereafter return to work. He told his fellow employee that he did not intend to return because he felt he had been treated unfairly, because when he was sent home, the hard work of putting the water on the fields had already been done and there remained only the easy work of watching the fields fill with water. The company's practice generally was to allow an irrigator who started a field to continue with it until the field filled with water, thus lengthening paid time and dividing the shift equally between hard and easy work. Because he felt he had been given more hard work to do than his fellow employee (tending two ditches instead of one) and was then deprived of the easy work of watching the field, Menesis did not want to continue working for the company.

█ The complaint issued by general counsel charged that petitioner had committed an unfair labor practice by discriminatorily assigning Menesis more work than was customary for the purpose of discouraging his union activities.

The ALO credited Menesis' testimony regarding his past experience as an irrigator and petitioner's usual practice of allowing an irrigator a full shift divided between doing ditch work and watching the field fill with water. However, the ALO also credited petitioner's evidence showing justification for the assignment given to Menesis. The ALO stated: "By having Menesis do more work than he was accustomed to doing and then depriving him of the full irrigation shift he expected, Loureiro was actively discriminating against Menesis in that he was treating him differently from the way other irrigators had usually been treated. That discrimination was justified by Loureiro on several basis [*sic*]. The field Menesis was working in was, in fact, slightly smaller than the usual 40 acre fields; and it was not unusual for him to make assignments such as he did to Menesis. The Respondent's evidence showed that Loureiro was a comparatively new irrigation foreman and the implication was that he was merely putting his own policies into effect when he made the decisions relating to Menesis....[¶] Here the discrimination against Menesis was comparatively slight, especially given the testimony from others that there was a general speed up at the Company, and the evidence of the Company's anti-union sentiments [was] almost absent....The Company's evidence...established multiple explanations for Loureiro's treatment of Menesis and thereby negated the inference of illegality. I find, therefore, that there was no violation and I shall recommend that the allegations of discrimination against Menesis be dismissed."

The Board affirmed the ALO's finding that petitioner had not constructively discharged Mr. Menesis, but it disagreed with his finding that Menesis was not discriminatorily assigned to more arduous work in order to discourage his participation in union activity. The entirety of Board's opinion in this regard reads: "The ALO credited Mr. Menesis' description of unfavorable changes in his work assignment. He found, however, insufficient evidence of anti-union motivation on Respondent's part to support the alleged violations. We disagree. The record contains numerous anti-union remarks by Respondent's supervisory personnel, amply indicative of animus toward the union. We find that whatever business justifications existed for the unfavorable assignments given to Mr. Menesis, these assignments would not have been made but for Respondent's desire to inhibit the exercise of rights protected by Section 1152. [Citation omitted.]"

Board's opinion mischaracterizes the basis for the ALO's decision, and its determination is not supported by substantial evidence on the whole record. The ALO did not find the evidence of antiunion animus nonexistent. The ALO expressly stated: "If no explanation had been offered to explain the treatment that Menesis received, the inference that the decisions relating to him were affected by the Company's knowledge of his Union activities (if shown) and its antipathy for the Union (if shown) would permit the inference that the treatment of Menesis was motivated by the Company's anti-union animus." The basis for the ALO's decision, however, was his crediting the evidence adduced by petitioner of business justification for Menesis' work assignment. What the ALO decided was that "Loureiro's treatment of Menesis was not shown to be motivated, even in part, by the Company's anti-union animus...."

The evidence of antiunion animus on the part of petitioner was exceedingly weak. There was some testimony about remarks by one or two supervisors that could possibly give rise to an inference of hostility toward the union, particularly on the part of Loureiro. However, the ALO specifically noted that "[t]he Respondent's evidence showed that Loureiro was a comparatively new irrigation foreman and the implication was that he was merely putting his own policies into effect when he made the decisions relating to Menesis." Board made no finding to the contrary. Otherwise, the uncontradicted evidence was that petitioner in no way interfered with its employees' union efforts. To the contrary, all of the witnesses, including those called by general counsel, portrayed petitioner as an employer that did not exhibit any antiunion animus.

Furthermore, while there was evidence that Menesis was a union supporter, he was not even employed by petitioner at the time of the organizational campaign which resulted in an overwhelming vote by petitioner's employees for unionization; he took no part in the campaign; and he did not even vote in the election. Had petitioner desired to discourage its employees from engaging in union activity, it certainly could have found a more likely prospect for retributive discriminatory assignment than Menesis. On the whole record there is no substantial evidence from which a rational inference can be drawn that there was any causal nexus between Menesis' work assignment and antiunion animus on the part of petitioner. Mere suspicion is not sufficient to sustain a finding that discriminatory conduct was motivated by employer animus. (*Royal Packing Co.* v. *Agricultural Labor Relations Bd.* (1980) 101 Cal.App.3d 826, 835 [161 Cal.Rptr. 870]; *N. L. R. B.* v. *Best Products Co., Inc., supra,* 618 F.2d at p. 74.)

### *Layoff of Irrigators and Shovelers*

On September 27 and 28, 1977, petitioner laid off six irrigators and shovelers who had been working for petitioner from one to nineteen years. Each was a union supporter and member, and that fact was known to petitioner. Four of the six workers laid off had been selected to be delegates to a UFW conference in Fresno. At the time of the layoffs each worker was personally informed by supervisor Diego Loureiro that there was not enough work at that time and that the worker would be called back either sometime in October or when there was more work to be done. None of the six workers was ever called back to work, though petitioner did hire a number of irrigators in October and November.

On the other hand, the evidence showed that petitioner was losing money on the particular crops involved and that petitioner had been laying off irrigators and shovelers gradually since June 3. The total number of irrigators during that period varied from a high of 32 to a low of 5. The six workers alleged to have been discriminatorily laid off were among the last to be laid off by petitioner at the very end of September, a full month after the union conference.

General counsel charged that petitioner had discriminatorily laid off these six irrigators and shovelers for engaging in union activities. The ALO found that petitioner had proved a viable business justification for the layoffs, namely, lack of work. The ALO found that

"[a]lthough there were [sic] some evidence of expressions of anti-union sentiment by supervisors such as Diego Loureiro and Roman Mandoza [sic] and the Company's president George Arakelian, the remarks were not of such character as to suggest the Company was motivated by anti-union animus in effecting the juggling of its work force to meet its employment needs." The ALO also noted that at the time these six workers were laid off, "virtually all of the irrigators and shovelers supported the Union and that any lay-off would have to have affected Union supporters." Petitioner had at that time no seniority system and no union contract, and its hiring, rehiring and callbacks were not based on any seniority system. Finally, no evidence was introduced concerning the union sentiments of those workers employed in the months of October and November who had not been employed in September. The ALO observed that it could not be concluded, therefore, that petitioner had laid off these workers in order to replace them with workers not sympathetic to the union. He concluded: "The absence of substantial evidence of selective lay-offs based on Union support, and a weak showing of the Company's anti-union sentiments lead me to conclude that the allegation of discrimination contained in . . . the Complaint do [sic] not have merit."

In overruling the findings and conclusions of the ALO, the Board again mischaracterized the ALO's reasoning and, further, misstated the evidence. It attributed the ALO's findings and conclusions solely to the fact that no evidence was presented as to the prounion or antiunion sentiments of workers hired in October and November instead of rehiring these laid-off workers. In its opinion, Board stated that it did not think the attitude of the replacement workers was relevant to the issue. Board applied the standard enunciated in *NLRB* v. *Great Dane Trailers* (1967) 388 U.S. 26 [18 L.Ed.2d 1027, 87 S.Ct. 1792], that when the employer's conduct is "inherently destructive" of important employee rights, no proof of antiunion animus is required to support a finding of an unfair labor practice. It misstated the evidence by concluding that "[n]o business justification was adduced for this action." Board then summarily concluded that the layoff of the six irrigators constituted an unfair labor practice.

We need not determine whether the rule announced in *Great Dane* is applicable to this fact situation so as to eliminate the need for general counsel to prove antiunion animus. Board's determination is un-

supported by substantial evidence whether or not proof of animus was required.[3]

Contrary to Board's statement, there was a good deal of evidence of business justification for the layoffs which the ALO expressly credited. Board's out-of-hand dismissal of this evidence does not supply the improper motivation required to make out the charge against petitioner. (See *N. L. R. B.* v. *Best Products Co., Inc., supra,* 618 F.2d at pp. 73-74; *N. L. R. B.* v. *Eastern Smelting & Refining Corp.* (1st Cir. 1979) 598 F.2d 666, 671.) ■ As has recently been stated by the First Division of this court in *Royal Packing Co.* v. *Agricultural Labor Relations Bd., supra,* 101 Cal.App.3d at page 833, "[i]n the absence of other circumstances, the employer has the right to discharge its employees (*N. L. R. B.* v. *Audio Industries, Inc.* (7th Cir. 1963) 313 F.2d 858, 861) and the mere fact an employee is or was participating in union activities does not insulate him from discharge for misconduct or give him immunity from ordinary employment decisions. (*Waterbury Community Antenna, Inc.* v. *N. L. R. B.* (1978) 587 F.2d 90, 97.) The reasoning of *Waterbury* is most instructive: '[W]here the employer was motivated by both valid and invalid reasons, a rule of causation is indispensable. A simple example will illustrate why this is so. If an employer discharges a union organizer in part because of organizational activities and in part because of repeated acts of industrial sabotage, it would be absurd to hold the discharge of that employee to be unlawful. The rule of causation applied in this Circuit is that "the General Counsel must at least provide a reasonable basis for inferring that the permissible ground alone would not have led to the discharge, so that it was partially motivated by an impermissible one." [Citations.] The magnitude of the impermissible ground is immaterial [citations] as long as it was the "but for" cause of the discharge [citations].'" (Accord: *N. L. R. B.* v. *Best Products Co., Inc., supra,* 618 F.2d at pp. 73-74.)

An employer may discharge an employee for any reason other than engaging in protected activity. (*N. L. R. B.* v. *Best Products Co., Inc., supra,* 618 F.2d at p. 74; *N. L. R. B* v. *Tayko Industries, Inc.* (9th Cir.

---

[3]If proof of antiunion animus was required, there is no substantial evidence of it. As the ALO specifically stated, "the remarks were not of such character as to suggest the Company was motivated by anti-union animus in effecting the juggling of its work force to meet its employment needs." The workers testified of one accord that petitioner had not previously interfered with their union activities, and one of the workers testified that he did not know why he was laid off, but he did not think it was because he supported the UFW.

1976) 543 F.2d 1120, 1124.) ▇ Board's finding that petitioner's motive was an unlawful one is supported only by its mistaken statement that petitioner offered no evidence of business justification for the lay-offs and the fact that five of these six employees out of the twenty-seven laid off since June were particularly active in union affairs. While the latter fact might be sufficient to give rise to a suspicion of unlawful motivation, what is lacking is substantial evidence from which the Board could draw the inference of a causal nexus—that these employees would not have been discharged "but for" their union activities. The finding of an unfair labor practice cannot be supported by mere suspicion. (*Royal Packing Co. v. Agricultural Labor Relations Bd., supra,* 101 Cal.App.3d at pp. 834-835; *N. L. R. B. v. Best Products Co., Inc., supra,* 618 F.2d at p. 74.)

### Dismissal of the Cantaloupe Harvesting Crew

▇ At 5:30 on the morning of June 11, 1977, Gilberto Pena assembled with the crew he supervised to harvest a field of cantaloupe. In the early stages of a melon harvest, melons are harvested by hand, using sacks. As more melons ripen, harvesting machines are employed with the workers sorting the melons and transferring them to waiting trucks. When picking melons by hand, workers received $3 per hour; when picking by machine, the crew as a unit received a piece rate of $4.50 per foot based on the number of feet (in height in the truck) of melons picked.

On this particular morning the melon harvesting machine was to be used, but it was not working when the crew arrived. After about an hour the machine was repaired and harvesting commenced. However, after a short time the machine once again broke down. While the crew waited for the machine to be repaired, Supervisor Ramon Mendoza visited the field and passed the word through Gilberto Pena that when the machine was repaired the crew was to work until the field was completely harvested.

Later that morning after the machine had broken down yet again, Mendoza returned to the field and asked Pena what had happened. The crew meanwhile had been discussing among themselves their pay rate and decided to ask Mendoza for a raise. They selected one from among them to act as a spokesman, who approached Mendoza within hearing of the entire crew. The spokesman asked Mendoza for a pay raise or, alternatively, that the crew be switched to another field where they

could earn more money. Mendoza responded that he did not think the company could give an increase and that there were workers from Calexico who would be willing to work for $2.95 an hour. Another member of the crew told Mendoza that he had heard that in Yuma, Arizona, the pay was $5 per foot and $7 per foot on weekends. Mendoza responded, "Only if you are in a union" and asked why, then, the crew members were not in Arizona. This conversation ended when Mendoza, as he was leaving, said he would see what he could fix up for the crew. The harvesting machine was once again repaired, and the crew worked until the lunch break.

After lunch, as the crew was returning to the machine, Mendoza's assistant, Manuel Soto, drove up in a company pickup truck and told crew leader Gilberto Pena to gather up the harvesting sacks because the crew no longer had work. Pena transmitted this message to the entire crew and told them they would have their checks by 3 o'clock that afternoon. The crew was in fact paid off about 5:30 that evening.

The testimony of the witnesses called by petitioner was in sharp conflict with that given by the crew members who were called to testify. In essence, the witnesses called by petitioner testified that the crew was not fired, but left the job because they did not want to hand-pick the melons with sacks.

The ALO did not credit the testimony of the witnesses called by petitioner. In his opinion he stated: "In addition to the consistency of the testimony of crew members who overheard the relevant conversations on June 11, the version of such witnesses is supported both by logic and permissible and reasonable inferences." Further: "The crew's cessation at noon, the delivery of their paychecks that evening, and the fact that only a few members of the crew worked for the Company after June 11 are all facts which taken together are convincing circumstantial evidence of a termination which was denied by the Company. In view of the facts supporting the workers' testimony that the entire crew was terminated, the Company surmise that the crew left voluntarily because the members felt they could earn better wages in Arizona is not persuasive. Accordingly, I conclude the Company violated Sections 1153(a) and (c) of the Act by terminating the Gilberto Pena cantalope [sic] harvesting crew for engaging in protected concerted activities on June 11, 1977."

Petitioner excepted only to the ALO's finding of a section 1153, subdivision (c) violation, contending that there was no union activity involved in the incident.[4] Board inaccurately states in its opinion that petitioner excepted only to the ALO's finding of a section 1153, subdivision (a) violation. Nevertheless, Board affirmed the ALO's findings of violations of both subdivisions (a) .and (c) of section 1153. In its answer to the petition for review, however, Board concedes that there was no 1153, subdivision (c) violation, because the cantaloupe crew incident involved protected concerted activity rather than union membership or activity.

In support of its contention that Board's determination that the cantaloupe crew was discharged for engaging in concerted activity is not supported by substantial evidence, petitioner notes that the evidence was in sharp conflict and relies upon the version of the evidence favorable to it. In so doing it fails to observe the proper scope of review. While this court must determine whether Board's determination is supported by substantial evidence on the whole record, we are required to view the evidence most favorably to the determination of the Board, and where the evidence is in sharp conflict, there is no valid basis for asserting insufficiency of the evidence.

In any event, both the ALO and the Board found that the crew was discharged and that they did not simply leave the job because they did not want to harvest the melons by hand with sacks. These findings are supported by substantial evidence. Significantly, the evidence indicates that the harvesting machine was operable at the time the crew returned for work after lunch so there would have been no need to pick by hand. Further, the crew was being paid on a per-hour basis, and according to the testimony of one of petitioner's foremen, the workers had not been asked to harvest with sacks instead of using the machine. Petitioner offered no business justification for the discharge of the cantaloupe crew; its position was that the crew was not fired, but quit. The ALO expressly credited the testimony of the members of the crew, and their testimony was, in effect, that they were fired.

---

[4]Section 1153 states in pertinent part: "It shall be an unfair labor practice for an agricultural employer to do any of the following:

"(a) To interfere with, restrain, or .coerce agricultural employees in the exercise of the rights guaranteed in Section 1152...

".     .     .     .     .     .     .     .     .     .     .     .     .

"(c) By discrimination in regard to the hiring or tenure of employment, or any term or condition of employment, to encourage or discourage membership in any labor organization."

We conclude that Board's determination that petitioner's discharge of the cantaloupe crew constituted a violation of section 1153, subdivision (a) is supported by substantial evidence.

### Board's Order

Those provisions in the order relating solely to the unfair labor practices for which no substantial evidence exists, must, of course, be annulled. In addition, inasmuch as we have concluded that two of the three unfair labor practices found by the Board are unsupported by substantial evidence, it is appropriate to remand the matter to the Board to reconsider its order. We are required, however, to address those questions of law that will in all likelihood recur on remand. (Code Civ. Proc., § 43.)

■ Provision 1(a) is the usual order that petitioner cease and desist from in any manner interfering with, restraining or coercing employees in the exercise of their ALRA rights. That portion of the order is overbroad. The language of the court in *Labor Board* v. *Express Pub. Co.* (1941) 312 U.S. 426, 433 [85 L.Ed. 930, 936, 61 S.Ct. 693] is apropos: "It is obvious that the order of the Board, which when judicially confirmed, the courts may be called on to enforce by contempt proceedings, must, like the injunction order of a court, state with reasonable specificity the acts which the respondent is to do or refrain from doing. It would seem equally clear that the authority conferred on the Board to restrain the practice which it has found the employer to have committed is not an authority to restrain generally all other unlawful practices which it has neither found to have been pursued nor persuasively to be related to the proven unlawful conduct." (Also cf. *N. L. R. B.* v. *Thompson Ramo Wooldridge, Inc.* (7th Cir. 1962) 305 F.2d 807, 810-811; and *N. L. R. B.* v. *Ampex Corporation* (7th Cir. 1971) 442 F.2d 82, 86-87, cert. den. 404 U.S. 939 [30 L.Ed.2d 252, 92 S.Ct. 274].)

Board's make whole order is also defective in several respects. It requires petitioner to "[o]ffer to reinstate the following members of the Gilberto Pena cantaloupe harvesting crew and any others who were employed as regular members of that crew as of June 11, 1977, and make them whole for any losses in pay and other economic losses they may have suffered as a result of Respondent's illegal termination of said crew: [here 24 individuals are named]. The amount to be paid to each crew member will be the sum he or she would have earned from June 11 to the date he or she is offered reinstatement to the same or a sub-

stantially equivalent position, less his or her net earnings during the interim, together with interest on the total award, computed at seven percent per annum. Employees who were regular members of the Gilberto Pena cantaloupe harvesting crew prior to June 11, 1977, *and had a reasonable expectation of continuing that employment after that date*, shall be considered to have been employed by Respondent on June 11 whether or not they were working or present at the work-site on that date." (Italics added.)

■ Among the named persons are five who had worked one or more days prior to June 11, 1977, as members of the crew but who did not work on June 11, 1977. Petitioner contends that these five persons should not have been named in the make whole order because there was no proof of why they did not work on June 11 and no proof that they would have worked as members of the crew after June 11 had employment been available. We agree. "[B]ack pay can only be awarded to those who would have worked during the period but for the discriminatory practices of the employer." (*N. L. R. B.* v. *Columbia Tribune Publishing Company* (8th Cir. 1974) 495 F.2d 1384, 1393.) Board itself recognized that principle by limiting the class of persons entitled to be made whole to those who were regular members of the crew prior to June 11 and who had a reasonable expectation of continuing that employment after that date. No evidence was presented that the five persons who had previously worked as members of the crew on one or more days but who did not work on June 11 would have worked after that date had the crew not been terminated or that they had a reasonable expectation of doing so. It was therefore improvident to include them among those entitled to be made whole.

The time period with respect to which the order required back wages to be paid is also incorrect. The order specifies the period "from June 11 [1977] to the date he or she is offered reinstatement to the same or a substantially equivalent position." These workers, however, were employed in harvesting cantaloupes. Such employment is neither continuous nor permanent and there is no evidence whatever that such employment would have continued from June 11 to, for example, the present time. The appropriate period would be from June 11, 1977, until such time as the harvesting of cantaloupes would have been completed.

## Disposition

Insofar as Board's decision determines petitioner committed a violation of section 1153, subdivision (a) by discharging the cantaloupe crew, it is affirmed; in all other respects it is annulled. Board's order is annulled for the purpose of permitting the Board to formulate a remedial order justified by the record and consistent with this decision.

Mortland, J.,* concurred.

**TAMURA, Acting P. J.**—I concur in the majority's conclusions except as to the irrigators and shovelers. In my opinion, there was substantial evidence to support the board's finding that layoff and refusal to rehire the six irrigators and shovelers constituted an unfair labor practice in violation of Labor Code section 1153, subdivisions (a) and (c). To that extent I respectfully dissent.

The majority's analysis, particularly as it relates to the unfair labor practice complaint concerning the irrigators and shovelers, focuses excessively upon the sufficiency of the evidence to support the administrative law officer's (ALO) recommended decision instead of upon the substantiality of the evidence to support the board's finding. In *N. L. R. B.* v. *Pacific Grinding Wheel Co., Inc.* (9th Cir. 1978) 572 F.2d 1343, the court aptly said of a somewhat similar judicial review approach advocated by the employer: "The company, to maximize the weight of the Administrative Law Judge's refusal to find a failure to bargain, argues that there is no evidence to support the Board's overruling of his recommendation. However, this is an incorrect formulation of the issue. The standard of review does not change simply because the Board has disagreed with the Administrative Law Judge." (*Id.*, at p. 1347.)

In interpreting the judicial review standard prescribed by the National Labor Relations Act (29 U.S.C. § 160 (f)), which is identical to that set forth in Labor Code section 1160.8, the federal courts have developed rules governing review of the labor board's factual findings when the findings are in disagreement with the recommended decision of the administrative law judge. I would supplement the majority's exposition

---

*Assigned by the Chairperson of the Judicial Council

of the law governing the scope of review with additional pertinent legal principles evolved under the federal experience.[1]

We must start with the fundamental proposition that in reviewing factual findings of the board we are not empowered to exercise our independent judgment on the weight of the evidence; our function is limited to determining whether the findings are supported by substantial evidence on the record as a whole. (Lab. Code, § 1160.8, *Tex-Cal Land Management, Inc.* v. *Agricultural Labor Relations Bd.* (1979) 24 Cal.3d 335, 346 [156 Cal.Rptr. 1, 595 P.2d 579]; *Universal Camera Corp.* v. *Labor Bd.* (1951) 340 U.S. 474, 484-485, 488 [95 L.Ed.456, 465-466, 71 S.Ct. 456].) Accordingly, if the evidence will support two fairly conflicting views, we may not displace the board's choice even though we might have reached a different conclusion had we been the fact finder. (*Universal Camera Corp.* v. *Labor Bd., supra*, 340 U.S. 474, 488 [95 L.Ed. 456, 467-468]; *N. L. R. B.* v. *Pacific Grinding Wheel Co., Inc., supra*, 572 F.2d 1343, 1347.)

Nor is the standard of review altered simply because the board has disagreed with the ALO; this court must still start with the board's finding and give it conclusive effect if it is supported by substantial evidence on the record as a whole. (*N. L. R. B.* v. *Pacific Grinding Wheel Co., Inc., supra*, 572 F.2d 1343, 1347; *N. L. R. B.* v. *Miller Redwood Company* (9th Cir. 1969) 407 F.2d 1366, 1369.) "[The] statutorily mandated deference to findings of fact runs in favor of the Board, not in favor of the initial trier-of-facts, the administrative law judge." (*Penasquitos Village, Inc.* v. *N. L. R. B.* (9th Cir. 1977) 565 F.2d 1074, 1076.)

The Legislature has placed upon the board, not on the ALO or the reviewing court, the responsibility for deciding whether a preponderance of the evidence shows that the person charged has engaged in an unfair labor practice. (Lab. Code, § 1160.3.) "The responsibility for decision thus placed on the Board is wholly inconsistent with the notion that it has power to reverse an examiner's findings only when they are 'clearly

---

[1]For an excellent discussion of the scope of judicial review of the board's factual findings, particularly when the board disagrees with the ALO's recommended findings, see Justice Staniforth's concurring opinion in *Abatti Farms, Inc.* v. *Agricultural Labor Relations Bd.* (1980) 107 Cal.App.3d 317, 333 [165 Cal.Rptr. 870], hearing denied, August 28, 1980.

erroneous.'" (*Universal Camera Corp.* v. *Labor Bd., supra*, 340 U.S. 474, 492 [95 L.Ed. 456, 470].)[2]

"The Board is free to draw its own inferences from the evidence available to it. Thus, if the Board can point to evidence which supports its inference, courts have allowed the Board's finding to stand despite the fact that the Administrative Law Judge interpreted the facts contrary to the inference drawn. [Citations.] [The] recent decision in *Penasquitos Village, Inc.* v. *NLRB*, 565 F.2d 1074 (9th Cir. 1977) illustrates that the Board has broad power to draw inferences from all the evidence presented.

"It is also well established that the Board need not treat self-serving declarations of an employer as conclusive, even if not contradicted by any direct testimony in the record. [Citation.] And it is disputed by none that, particularly when the Board is trying to establish motive and intent, all the circumstances of the case must be considered. [Citations.]" (*N.L.R.B.* v. *Pacific Grinding Wheel Co., Inc., supra*, 572 F.2d 1343, 1347.)

Applying the foregoing principles to the instant case, there is substantial evidence on the record as a whole to support the board's finding that layoff and refusal to rehire the six irrigators constituted an unfair

---

[2]The majority cites recent decisions of the Supreme Court and Courts of Appeal in the workers' compensation field pertaining to the weight to be given certain findings of a workers' compensation judge as having some bearing on the weight to be given the ALO's recommended decision. The principle has been expressed in the following terms: "When a referee's *finding of compensable injury* is supported by solid, credible evidence, it is to be accorded great weight by the Board and should be rejected only on the basis of contrary evidence of considerable substantiality." (Italics supplied, *Lamb* v. *Workmen's Comp. Appeals Bd.*, (1974) 11 Cal.3d 274, 281 [113 Cal.Rptr. 162, 520 P.2d 978]; *Garza* v. *Workmen's Comp. App. Bd.* (1970) 3 Cal.3d 312, 318-319 [90 Cal.Rptr. 355, 475 P.2d 451]; *Greenberg* v. *Workmen's Comp. Appeals Bd.* (1974) 37 Cal.App.3d 792, 799 [112 Cal.Rptr. 626].) It should be noted that in all of the cited cases, the referee found "compensable injury" but the board, on reconsideration, set aside the referee's decision. The great weight given a referee's finding of "compensable injury" when supported by such credible evidence comports with the legislative policy that the Workers' Compensation Act must be liberally construed in the employee's favor (Lab. Code, § 3202) and that all reasonable doubts as to whether an injury arose out of the employment should be resolved in favor of the employee. (*Garza* v. *Workmen's Comp. App. Bd., supra*, 3 Cal.3d 312, 317.) There is no comparable policy underlying the ALRA which would require like weight to be given an ALO's decision declining to find an unfair labor practice. Indeed, "the entire ALRA is designed to provide agricultural workers with protection of their collective bargaining rights comparable to that provided nonagricultural workers by the NLRA." (*Tex-Cal Land Management, Inc.* v. *Agricultural Labor Relations Bd., supra*, 24 Cal.3d 335, 345.)

labor practice. Five of the six were the most active union organizers and supporters among petitioner's employees; four of them were delegates to the union convention held in August 1977, a month before the dismissal; and one was a fund raiser for the convention. The six were laid off in September 1977 and not a single one of them was rehired even though eleven irrigators and shovelers were hired during October and November 1977. There was substantial evidence of antiunion animus on the part of supervisor Loureiro who gave the layoff orders and told the workers they would be recalled either in October or when more work was available. Petitioner attempted to establish economic justification for the layoffs through the testimony of its bookkeeper. However, she was neither an accountant nor an expert in crop production; she admitted she was mistaken as to certain loss estimates to which she had testified; no company profit and loss statement was introduced; much of her testimony was based, not upon company records, but upon estimates given to her by her superiors. The weight to be given to her testimony was a matter for the board. Furthermore, petitioners continued on the payroll more than six irrigators and shovelers and hired eleven more in October and November 1977. The board could reasonably find that while economic considerations may have justified a reduction in the work force, it did not justify dismissal of the most active union supporters while retaining others and did not justify refusal to rehire any of the dismissed union leaders while other hiring and rehiring was taking place. As the Supreme Court said in *Tex-Cal Land Management, Inc. v. Agricultural Labor Relations Bd., supra*, 24 Cal.3d 335, in upholding an ALRB finding that certain layoffs were discriminatory despite the employer's contention that the layoffs were economically justified: "Yet an apparently justifiable ground for discharge may in fact be a pretext for unlawful discrimination." (*Id.*, at pp. 352-353.)

In *Abatti Farms, Inc. v. Agricultural Labor Relations Bd., supra*, 107 Cal.App.3d 317, Division One of this court upheld a board finding that layoff and refusal to rehire workers under like circumstances constituted an unfair labor practice, stating: "We conclude the Board findings of impermissible discharge or refusal to rehire are entitled to enforcement. The evidence of wrongful motive is circumstantial, but sufficient. We may not substitute our judgment for that of the Board in its area of special expertise, the assessment of the weight of circumstantial evidence in context." (*Abatti Farms, Inc. v. Agricultural Labor Relations Bd., supra*, 107 Cal.App.3d 317, 333.) Those observations apply with equal force in this case.

283

I would uphold the board's findings in all respects except as to the discriminatory work assignment complaint involving Jose Luis Menesis and would remand the matter for modification of the board's remedial order in accordance with the views expressed by the majority except insofar as it requires annulment of the order as to the six irrigators and shovelers.

The petitions of all the parties for a hearing by the Supreme Court were denied January 14, 1981. Bird, C. J., did not participate therein.