[Civ. No. 20040. Fourth Dist., Div. Two. Feb. 16, 1979.]

STEVE P. RADOS, INC., Plaintiff and Appellant, v.
CALIFORNIA OCCUPATIONAL SAFETY AND HEALTH
APPEALS BOARD, Defendant and Respondent;
DIVISION OF INDUSTRIAL SAFETY, Real Party in Interest and
Respondent.

**COUNSEL**

Regan, Drummy, Garrett & King and Alan I. White for Plaintiff and Appellant.

Evelle J. Younger and George Deukmejian, Attorneys General, and William R. Winship, Jr., Deputy Attorney General for Defendant and Respondent and for Real Party in Interest and Respondent.

**OPINION**

**KAUFMAN, J.**—In a decision after reconsideration the California Occupational Safety and Health Appeals Board (Board) determined that Steve P. Rados, Inc. had violated a construction safety order and assessed against Rados a civil penalty in the amount of $300 based upon its finding that the violation was a "serious violation." Pursuing its statutory right of review, Rados petitioned the Orange County Superior Court for a writ of mandate. An alternative writ issued, but the peremptory writ was denied. Rados appeals. (All statutory references will be to the Labor Code unless otherwise specified.)

*Facts*

The Division of Industrial Safety (Division) within the Department of Industrial Relations is the state agency charged with enforcing occupational safety and health standards and orders. (See §§ 50, 50.7, 56, 6307, 6308.) Rados is a licensed contractor and on January 21, 1976, was engaged in laying a large sewer pipe in San Diego. On that day Charles Fox, a safety inspector employed by Division, inspected the construction site. On February 2, 1976, Division issued to Rados a citation[1] assessing a civil penalty of $700 against Rados for a "serious violation"[2] of a construction safety order promulgated by Division (Cal. Admin. Code, tit. 8, § 1541, subd. (a)), which requires that all trenches five feet or more in depth, in all types of earth, be "effectively guarded against the hazard of moving ground . . . ." (See § 6317.)

Rados filed a timely notice of intention to contest or appeal the citation. (See § 6600.) Accordingly, Board set the matter for hearing before a hearing officer (administrative law judge, ALJ) employed by Board to conduct such evidentiary hearings. (See §§ 6604-6608.) The ALJ found that Rados did violate the construction safety order as alleged by Division, found the violation constituted a "serious violation" and denied Rados' appeal except for reducing the civil penalty assessed from $700 to $300.[3]

Rados timely filed a petition for reconsideration on grounds that the ALJ's decision was not supported by the findings and the findings were not supported by the evidence. (See §§ 6614-6617.) Board granted the petition for reconsideration but, based on the record and without further proceedings, issued its own findings and decision after reconsideration, in effect affirming the decision of the ALJ.

---

[1]Actually two citations were issued by division to Rados. However, the other citation was for violation of a safety order dealing with the accessibility of a fire extinguisher (Cal. Admin. Code, tit. 8, § 1582.20) and is not involved in this appeal.

[2]Section 6432 reads in pertinent part: "[A] 'serious violation' shall be deemed to exist in a place of employment if there is a substantial probability that death or serious physical harm could result from a condition which exists, or from one or more practices . . . which have been adopted or are in use, in such place of employment unless the employer did not, and could not with the exercise of reasonable diligence, know of the presence of the violation."

[3]For a "serious violation" the employer "shall be assessed a civil penalty of up to one thousand dollars . . . ." (§ 6428.)

Exercising its statutory right to judicial review, Rados petitioned the Orange County Superior Court for a writ of administrative mandate. (See § 6627.) An alternative writ of mandate issued and, after a "hearing,"[4] the court denied issuance of the peremptory writ and entered judgment in favor of Board.

### Contentions, Issues and Discussion

On appeal Rados contends that Board's determinations that Rados violated the safety order and that the violation constituted a "serious violation" are not supported by substantial evidence. Board contends to the contrary.

### Scope of Review in the Trial Court and on Appeal

■ Board is mistaken as to the proper scope of review both in the trial court and on appeal. With respect to the trial court's function, Board asserts that the familiar "any substantial evidence" test is applicable and that the trial court was required to ascertain whether there was any evidence in support of Board's decision and to disregard any conflicting evidence found in the record. On the contrary, the applicable scope of review in the trial court was that of "substantial evidence" "based upon the entire record." (§ 6629;[5] see *Bixby* v. *Pierno*, 4 Cal.3d 130, 149, fn. 22 [93 Cal.Rptr. 234, 481 P.2d 242].) This standard is identical to that applicable in judicial review of a decision by the Workers' Compensation

[4]The hearing was abbreviated to say the least. The complete reporter's transcript consists of six pages of dialogue between the court and counsel. Although the administrative record had been forwarded to the court as ordered in the alternative writ, the record indicates the trial court did not actually read the administrative transcript, notwithstanding that the question before it was whether the decision by Board was supported by substantial evidence on the whole record. When the case was called, the court announced: "I really want to hear from the applicant seeking the writ of mandate telling me why I should restrain this Board . . . . I have read all the papers." Counsel for Rados asked: "Has the Court had an opportunity to review the transcript?" The court replied: "We apparently got the transcript in, yes. That has been reviewed by the legal research people." Since we have concluded that the Board's decision is not supported by substantial evidence, we do not reach Rados' contention it was deprived of a fair trial by the trial court's failure to personally read the administrative record.

[5]Section 6629 reads in part:

"The review by the court shall not be extended further than to determine, *based upon the entire record* which shall be certified by the appeals board, whether:

"(a)  The appeals board acted without or in excess of its powers.

"(b)  The order or decision was procured by fraud.

"(c)  The order or decision was unreasonable.

"(d)  The order or decision was not supported by substantial evidence." (Italics added.)

Appeals Board as prescribed in section 5952 as to which the Supreme Court explained in *Le Vesque* v. *Workmen's Comp. App. Bd.,* 1 Cal.3d 627, 638-639, footnote 22 [83 Cal.Rptr. 208, 463 P.2d 432]: "The reviewing court must consider the entire record (Lab. Code, § 5952) and may not isolate only the evidence which supports the board's findings [citation] and thus disregard relevant evidence in the record. [Citation.]" In *Garza* v. *Workmen's Comp. App. Bd.,* 3 Cal.3d 312, 317 [90 Cal.Rptr. 355, 475 P.2d 451], the court further explicated the rule: "In *Le Vesque, supra,* this court rejected prior decisions which suggested that the board's decision would be sustained if supported by any evidence whatsoever, and we determined that the test of substantiality must be measured on the basis of the entire record, rather than by simply isolating evidence which supports the board and ignoring other relevant facts of record which rebut or explain that evidence."

By some of its arguments and its citation to *Drysdale* v. *Department of Human Resources Development,* 77 Cal.App.3d 345, 351-352 [142 Cal.Rptr. 495], Board appears to contend that the proper function of this court on appeal from the judgment of the superior court denying the writ of mandate is to determine whether the judgment of the trial court is supported by any substantial evidence, disregarding conflicting evidence. It is true the *Drysdale* decision expressly employed that scope of review, but *Drysdale* involved an appeal from a judgment of the superior court in which the superior court was called upon to exercise its *independent judgment on the evidence* to determine if the findings of the California Unemployment Insurance Appeals Board were supported by the *weight* of the evidence. (77 Cal.App.3d at p. 351.) Where the proper scope of review in the trial court was whether the administrative decision was supported by substantial evidence on the whole record, the function of the reviewing court on appeal from the judgment is the same as that of the trial court, that is, to review the administrative decision to determine whether it is supported by substantial evidence on the whole record. (See *Bixby* v. *Pierno, supra,* 4 Cal.3d at p. 149, incl. fn. 22; see also *Sunset Amusement Co.* v. *Board of Police Commissioners,* 7 Cal.3d 64, 76 [101 Cal.Rptr. 768, 496 P.2d 840]; cf. *Lewin* v. *St. Joseph Hospital of Orange,* 82 Cal.App.3d 368, 386 [146 Cal.Rptr. 892].)

■ *Substantial Evidence on the Whole Record*

As Board indicated in its decision after reconsideration, the requirement that all trenches five feet or more in depth "be effectively guarded

against the hazard of moving ground" may be satisfied by the use of shoring, by the use of shoring units or protective shields or by adequate sloping of the trench walls.[6] Section 1540, subdivision (d) of title 8 of the California Administrative Code provides that in lieu of shoring, the sides or walls of a trench may be sloped if equivalent protection is thus afforded and that a slope of three-fourth horizontal to one vertical is deemed adequate except where the instability of the ground requires a greater slope. (See fn. 6, *ante*.)

The trench in which Rados was laying the sewer pipe was approximately 19 feet in depth. There was no evidence of any instability of the ground requiring a slope in excess of three-fourth to one. The ALJ summarized the testimony of Inspector Fox as follows:

"Mr. Fox testified that in laying sewer pipe in the excavation appellant used a metal shield within which appellant's employees laid the pipe. He stated that in using this procedure when one pipe section is completed the shield is moved on along the unshored trench in preparation for laying additional pipe. In this instance, the shield had been moved in readiness for additional pipe to be laid leaving the area where the pipe was already laid unprotected. He observed one of appellant's employees standing in the bottom of the excavation along side the pipe working on a pipe stub to be used for a lateral sewer line. The area in which appellant's employee was working at the bottom of the excavation between the pipe and the unshored excavation was approximately 4 feet wide and 20 feet long. The lower 6 feet of the excavation wall was at an angle of ¼ to 1. Six feet above the bottom of the excavation the soil was cut back at an angle of ¾ to 1 for the remaining 13 feet to the top of the excavation. The diameter of the pipe as it lay in the excavation was approximately five and one-half feet high. Mr. Fox also stated that there was a truck crane located approximately eight feet away from the excavation. He added that he classified the violation as serious since there was a substantial probability that death or serious physical harm could have resulted to the employee from the condition in the event of a cave-in."

---

[6]Section 1541, subdivision (a) of title 8 of the California Administrative Code requiring effective guarding makes reference to "Plate C-23, Appendix." Plate C-23, appendix, which deals generally with shoring, contains a note reading: "Sloping of trench walls may be substituted for shoring only as allowed by Order 1540(d)." Order 1540(d) (Cal. Admin. Code, tit. 8, § 1540, subd. (d)) reads: "In lieu of a shoring system, the sides or walls of an excavation may be sloped, provided equivalent protection is thus afforded. Where sloping is a substitute for shoring that would otherwise be needed, it shall be ¾ horizontal to 1 vertical except where the instability of material requires a slope greater than ¾ to 1."

The ALJ found: "The credible evidence presented established that appellant's employee was working in an unshored area of a trench 4 feet wide by 20 feet long formed by an exposed pipe 5½ feet high on one side and a 6 foot high nearly vertical wall on the other side within the 19 foot excavation. The foregoing evidence also supports the conclusion that there was a substantial probability that death or serious physical harm could have resulted to appellant's employee from the condition."

In its decision after reconsideration the Board stated:[7]

"In the instant case, Petitioner was allegedly utilizing a combination of the permissible methods in laying a sewer pipe in a trench. The evidence established that a shield was being used in conjunction with sloping. The shield was being used in the bottom or lowest six feet of the trench and the soil was 'cut' or 'laid' back at an angle of ¾ to 1 for the remaining 13 feet of depth of the trench. Such a procedure is consistent with the mandate of section 1541 that effective guarding be present in all trenches over five feet in depth.

"It was established in this appeal, however, that an employee of Petitioner was in the bottom six feet of the trench and was working in an area not protected by the shoring shield. *This employee was clearly exposed to the absence of any protection whatsoever from that part of the adjacent trench wall which was neither adequately sloped, nor shored nor otherwise guarded. It is this exposure which resulted in the alleged violation of section 1541(a)* which was properly confirmed by the September 15, 1976, decision of the Administrative Law Judge herein. The citation was correctly characterized as serious as a substantial probability did exist that the exposed employee could have been killed or seriously injured if the trench had collapsed in that area where the exposed employee was working. The evidence also established that Petitioner was either aware or could have become aware of the exposure of one of its employees to the potentially hazardous situation." (Italics added.)

Thus both the ALJ and the Board concluded that the only valid basis for the citation for violation of order 1541(a) was Rados' permitting an employee to work in the area between the sewer pipe and the earth wall on the side of and adjacent to the lateral stub.

[7]Section 6623 requires any decision of the Board granting or denying a petition for reconsideration to state the evidence relied upon and specify in detail the reasons for the decision.

Board's assertion on appeal that it is undisputed that the walls of the lower eight feet of the trench were "practically vertical," suggests that Rados is correct in contending that neither the ALJ nor the Board has ever understood *its primary contention in the case, that the lower portion of the trench wall in the area of the lateral stub and adjacent to the stub, unlike other portions of the trench walls, was not "practically vertical" but was in fact sloped at three-fourth to one* and that Division did not meet its burden of proof by presenting evidence substantial on the whole record that the slope of the trench wall at that location was any less than three-fourth to one. After a careful review of the record and keeping in mind the difference between the "any substantial evidence" test and the "substantial evidence on the whole record" test, we have concluded that Rados is correct.

*Preliminarily, we observe that the ALJ had great difficulty understanding the testimony of both principal witnesses, Inspector Fox for the Division and Arthur Bostow, project manager for Rados.* Both witnesses were accustomed to describing the sloping of trench walls in ratios such as three-fourth to one, the same manner in which the construction safety orders promulgated by division describe such slopes (see, e.g., Cal. Admin. Code, tit. 8, § 1540, subd. (d) quoted in fn. 6, *ante*). The ALJ, however, several times indicated that he was not "familiar with this type of work" and that he simply could not understand the testimony phrased in such terms as three-fourth to one. He insisted that the witnesses describe the slopes in terms of degrees even though both of them indicated they were not accustomed to describing the slopes in that manner and were uncertain of the equivalent in degrees for such proportions as three-fourth to one, one-half to one and one-fourth to one.[8]

Fox's testimony was not easy to follow. He testified about the slope of the trench wall in general, on one side of the trench and the other, and at particular portions of the trench. In so doing, he testified variously that the slopes were "practically vertical," "¼ to 1," "½ to 1," "¾ to 1," and in degrees ranging from 11 to 45 (see fn. 8, *ante*). A careful reading of the transcript reveals that his testimony about the bottom six or eight feet of the trench being "practically vertical" was given almost exclusively in

---

[8]One outstanding example of the confusion thus created was Fox's repeated testimony that he estimated a certain slope at 30 degrees and then, upon being informed that a 30-degree slope would be the equivalent of ¾ to 1, changing his testimony to make the slope "22 to 23 degrees."

connection with his general description of the trench and the procedure used by Rados in connection with the shield. This is consistent with the diagram drawn by Fox and introduced as an exhibit which represents Fox's image of a cross-section of the trench and depicts the walls on both sides of the trench up to six or eight feet as being only at slight angles to the vertical sides of the shield being used by Rados. This cross-section obviously does not accurately represent the area of the lateral stub because it shows the shield in place opposite the wall and shows the shield equidistant from each wall whereas in the area of the stub all parties agreed and the photographs introduced into evidence clearly show that the shield was not there and that the trench wall "was laid back more" than elsewhere in the trench. Opposite the stub the distance between the side of the pipe and the trench wall was about four feet, according to Mr. Fox, whereas he estimated the entire width of the trench at the bottom in all other portions as eight to ten feet, and the pipe itself was about five and a half feet in diameter (outside dimensions) according to his estimate. Fox did at one point testify that the *left* wall of the trench, which is not here in issue, was cut vertically at the bottom eight feet, approximately. He also testified that he estimated the slope of the *left* trench wall at one-fourth to one.

With respect to the specific area in question, however, the right trench wall in the area of the lateral stub, Fox's testimony was that at the time of his original inspection he estimated from certain calculations he made based on information appearing on several survey stakes that the slope was .63 to 1. On numerous occasions he testified that he estimated the lower six feet of that portion of the trench wall to be sloped at one-half to one.[9] The slope of one-fourth to one was mentioned by Fox only twice in connection with the specific area in question. First, he testified that in

---

[9]For example, just after Fox testified the bottom portion of the left trench wall was cut "vertical," referring to photograph number 2 taken by Fox during his inspection and which represents the situation on the basis of which the citation was issued, the ALJ asked Fox: "[W]e're coming back to the man that's bent over at that . . . exposed stub. On the one side he has the pipe, on the other side he has his unshored dirt, and you were . . . testify that this was cut back. Was it cut back down where he was standing, or was it vertical?" Fox replied: "*It was not vertical.*" The ALJ asked: "What was it?" Fox answered: "It was . . . it was laid back uh . . . *I would estimate that that lower six feet was cut back one-half-to-one.*" The ALJ then asked Fox to convert one-half to one to degrees, and Fox estimated the slope at 30 degrees (see fn. 8, *ante*). Shortly thereafter the ALJ said: ". . . so he was exposed then to a . . . to an unshored area, which was about thirty degrees off vertical . . . and this was six feet high and then on the other side he had the pipe which was five and a half feet high. And there was a four foot . . . did you say four foot width? Is that right?" Fox said, ". . . yes." The ALJ then asked: "And was it on this basis that you . . . cited the Appellant?" Fox replied: "Yes." (Italics added.)

discussing the matter with Bostow, apparently during the first inspection, Fox had stated his belief that the wall was about one-fourth to one and Bostow had asserted that it was about one-half to one. (Bostow confirmed the conversation but testified he had said the slope was *more* than one-half to one.) Secondly, and apparently in some fashion related to his testimony of his original impression, Fox testified under cross-examination: "I'd like to go back a little bit. I believe, I did uh . . . in answer to your question, Your Honor, I said it was one-half-to-one. And on the day of the inspection, I contend that this slope . . . this lower six feet of the slope was approximately one-quarter-to-one, which is about 11 degrees."

Without attempting to fix with precision the exact slope Inspector Fox may fairly be said to have testified the trench wall was in the specific area in question, it is sufficient to say that, were the "any substantial evidence" test applicable, his testimony would probably be sufficient to support a finding that the slope of the wall in the area of the stub was something less than three-fourth to one. But under the "substantial evidence on the whole record" test, Fox's testimony must be further evaluated in the light of the entire record. In that light it cannot be said to constitute substantial evidence sufficient to support the necessary finding.

On behalf of Rados, Bostow, a registered civil engineer educated at the University of Southern California, who had taken courses in geology and soil mechanics and had 21 years of experience in pipeline and trench construction, positively testified that he went into the trench shortly after Fox's original inspection, measured the slope of the trench wall in the area of the stub and found it to be three-fourth to one.

On the other hand, Fox, who was not a civil engineer, geologist or soil expert, and who had been employed by Division about two and a half years and was a construction inspector for about twelve years before that, testified that in making his inspection he made no actual measurements whatever of the trench or any part of it. His estimates of the various slopes were based upon his ascertainment of certain of the proposed figures for construction found by him on survey stakes. He drew a hypothetical line between two stakes and by use of other hypothetical lines estimated the depth of the trench, the midpoint of the pipe and several other dimensions, and based on these calculations he estimated the angles of several of the slopes concerning which he testified. This was the procedure by which he estimated the overall slope of the right trench

wall in the area of the lateral stub at .63 to 1. His estimates of certain portions of the trench walls, particularly the left trench wall, at one-fourth to one were based on his comparison of those portions of the walls with the vertical sides of the shield Rados was using. When ultimately pressed to explain how he made his original estimate that the slope of the lower six feet of the right wall in the area of the lateral stub on the day of his original inspection was one-fourth to one, he testified: "Just be [*sic*] comparison with the existing trench." Thus, not only did Fox's estimate of the slope of the right trench wall in the area of the lateral stub vary from one-fourth to one, or 11 degrees, to one-half to one, or 22 to 23 degrees as finally estimated by him, but the foundation for his estimates must be characterized as somewhere between weak and nonexistent. In addition, although Fox did not utilize it, Bostow testified there was equipment available at the jobsite by which accurate measurements could have been taken without entering the trench.[10]

In a case involving somewhat similar circumstances, Board has itself indicated that Division must establish the existence of this sort of violation by accurate measurements of the trench. In its decision in *In the Matter of Appeal of: Halopoff & Sons, Inc.,* OSHAB Docket No. 74-R5D2-576 (July 18, 1975) the Board adopted the proposed decision of its hearing officer which read in pertinent part: "The alleged violation is based upon the Division's estimate that the width at the top of the trench was a maximum of 12 feet [whereas the appellant's evidence indicated the width at the top was 18 feet]. It is noted that the Division's representative estimated the dimensions of the trench and also testified that the pipe in the trench was 30 inches in diameter when Appellant's more convincing evidence was that the pipe was 8 inches in diameter. The estimating ability of the Division's representative was somewhat discredited by the evidence presented. Additionally, the evidence reveals that equipment was available at the jobsite to take accurate measurements of the dimensions of the trench. [See fn. 10, *ante.*] The Division has the burden of proof to substantiate its allegations but chose to rely upon estimates in this case. Such estimates are not adequate because evidence presented reveals that adequate sloping was provided by Appellant." (*Id.,* at pp. 3-4.)

In addition to the initial weakness of Fox's testimony, there was uncontroverted evidence that virtually destroyed the probative value of his estimate that the slope of the bottom six feet of the right trench wall in

---

[10]The ALJ several times precluded Rados from attempting to present such testimony, but it eventually slipped in anyway. The ALJ indicated he felt it was irrelevant. It was not.

the area of the lateral stub was either one-fourth to one or one-half to one. Fox conceded that his slope angle estimates were based on his observations from outside of and on top the trench. The uncontradicted testimony of Arthur Bostow, corroborated by Robert Radich, Rados' superintendent, and confirmed by Fox himself, establishes that approximately two days after he made his original inspection, Fox returned to the jobsite and again observed the trench from his vantage point on top and outside, at which time he said: "Now see, it's steep. It's good on the top, but the bottom is still too steep." Thereupon, Fox went into the trench with Bostow and Radich. When Fox went down into the trench he said: "It looks different now than it looked from the top." Further: "[T]he closer I get to this, the more it looks like three-quarters-to-one." Then Fox measured the slope, determined it to be three-fourth to one and authorized the recommencement of work.

Fox was recalled as a witness and when asked about the foregoing testimony, stated: "I uh . . . when I went down in there the . . . it . . . I will say that their . . . their statements are correct, that uh . . . the . . . from up on top, I objected to the slope still being to [sic] steep . . . down in the bottom. Uh . . . that slope had been laid back at the top approximately four feet more at the upper portion uh . . . at the . . . four feet back from where it was when I first made the inspection. I did go down in . . . into the trench, and I measured as best as I could, from the bottom uh . . . using a tape as a plum [sic] line and established that point as being three-quarter-to-one."

It is true that Fox answered, "No, sir" to a question by the ALJ whether it was his conclusion that the angle of the slope at the point where Rados' employee was working at the stub was the same on his reinspection as it was at the time of the first inspection. He also answered, "Yes, sir" to the ALJ's question: "But you were of the . . . you were of the definite opinion that . . . that there was a change in the angle, is that right?" These responses must be considered of dubious probative value, however, in view of the leading nature of the questions and, particularly, in view of Fox's reply to the ALJ's question as to what led Fox to believe that there was a change in the angle of the slope from the time Fox conducted his first inspection until his later visit. The answer was: "Material had . . . had sloughed down into the . . . more in . . . into the trench and also the stub had been broken off." Neither of these circumstances, of course, would have changed the angle of the slope.

Both Bostow and Angel Barba, the employee whose working in the area in question gave rise to the citation, testified positively that the slope of the lower six feet of the right trench wall in the vicinity of the lateral stub had not been altered since the original inspection, and the photographic evidence (*infra*) supports their testimony. It was uncontroverted, of course, that subsequent to the original inspection the upper portion of the right trench wall had been laid back an additional four feet, and Bostow testified this brought the slope of the upper portion of the trench wall to one to one.

Finally, there are the photographs taken by Fox at the time of his original inspection and introduced into evidence. Photographs constitute notoriously poor evidence of angles or degrees of slope or incline because in that respect what is observed may well depend upon the angle at which the camera was held and the point from which the photograph was taken. Of the seven photographs only those numbered 1 and 2 are of any possible evidentiary value in respect to the slope of the particular portion of the right trench wall in question. In the photograph numbered 1, however, the entire trench wall in the crucial area is in dark shadow and gives no reliable indication of the slope. The photograph numbered 2 is the photograph of the actual situation observed by Inspector Fox as the violation for which Rados was cited. It shows Angel Barba working in a standing but bent-over position next to the right trench wall at the point of the lateral stub. Consistent with the testimony at the hearing, those portions of the right trench wall on either side of Mr. Barba and at some distance from him appear to be relatively steep. However, although it is somewhat in shade, the right trench wall opposite the lateral stub is obviously laid back and has a substantially greater slope angle than the other portions of the trench wall. While there is a sharp break in the slope of the other portions of the trench wall, in the particular area in question the slope appears to go down almost to the bottom of the trench. Bearing in mind that this is the photograph taken by Inspector Fox of the situation giving rise to the citation, not several days later when Fox reinspected the trench, it is corroborative of the evidence presented by Rados, not that of Division.

We conclude that viewed in the light of the whole record, Inspector Fox's testimony as to his estimates of the angle of slope of the area in question does not constitute substantial evidence that the slope was less than three-fourth to one.

We are cognizant of the dangers to which workers may be exposed when employers fail to comply fully with safety regulations. We also recognize the need for strict enforcement of the safety regulations by Division in carrying out its legislative mandate to promote the safety and well-being of workers in their places of employment. However, high purpose and laudatory objectives do not relieve Division of its burden to prove contested charges of violation by evidence substantial on the whole record. As the United States Supreme Court stated in *Universal Camera Corp.* v. *Labor Bd.,* 340 U.S. 474, 490 [95 L.Ed. 456, 468-469, 71 S.Ct. 456] explicating the "substantial evidence on the whole record" standard of review enacted by Congress in respect to decisions of the National Labor Relations Board: "The Board's findings are entitled to respect; but they must nonetheless be set aside when the record . . . clearly precludes Board's decision from being justified by a fair estimate of the worth of the testimony of witnesses or its informed judgment on matters within its special competence or both."

In view of our conclusion that viewed in the light of the whole record there is no substantial evidence that Rados violated the safety order, it is unnecessary for us to consider Rados' contention that the uncontroverted evidence, including a slope stability analysis by a firm of consulting engineers and geologists, establishes that the alleged violation was not a "serious violation" (see fn. 2, *ante*).

### Disposition

The judgment is reversed with directions to the trial court to issue a peremptory writ of mandate commanding Board to vacate and annul its order and decision after reconsideration insofar as it adjudicates that petitioner violated safety order 1541(a).

Tamura, Acting P. J., and McDaniel, J., concurred.