[No. F004223. Fifth Dist., Oct. 2, 1985.]

THOMAS W. JAMES, Plaintiff and Appellant, v.
BOARD OF DENTAL EXAMINERS, Defendant and Respondent.

1102

COUNSEL

Brunn & Thayer and Timothy T. Flynn for Plaintiff and Appellant.

John K. Van de Kamp, Attorney General, and Steven M. Kahn, Deputy Attorney General, for Defendant and Respondent.

OPINION

**HANSON (P. D.), J.**—The Board of Dental Examiners, by accusation and a supplemental accusation, charged Thomas W. James, D.M.D., with negligence, incompetence and inefficiency in the treatment of six dental patients. An administrative law judge (ALJ) held a four-day hearing and by proposed decision found for Dr. James on one claim; found that clear and convincing evidence supported claims of abandonment as to one patient; incompetence as to two other patients; and negligence as to two remaining patients. The ALJ also determined each of the above acts constituted unprofessional conduct. The proposed decision ordering the revocation of Dr. James' dental license was adopted by the Board of Dental Examiners (the Board).

Dr. James petitioned the Stanislaus County Superior Court for a writ of mandate to review the determination of the Board. A hearing on the petition lasted less than one day. The court issued a tentative decision denying the petition. Dr. James' request for a statement of decision was denied as untimely and his petition was denied. This appeal followed. We reverse for several reasons and remand with directions.

FACTS

Dr. James, 67 years old at the time of the administrative hearing, received his D.M.D. in 1946. From 1947 to 1950, he had a fellowship in oral surgery at the Mayo Foundation and received a master of science degree in oral surgery. He was an oral surgeon in the Army. He taught oral surgery at the University of Washington for five years and had three professional publications to his credit. He held dental licenses in Washington, California and Minnesota.

In 1960, he began to practice in California, and in 1978, in Modesto. Until 1972, approximately 90 percent of his practice was confined to oral surgery. During most of the relevant period, he had two offices in Modesto. He worked at both offices; other dentists also worked at his offices. The nature of the relationship of the other dentists, employees or independent contractors, was hotly disputed below.

Dr. Charles Arena, a Modesto dentist, was contacted by the Board to examine the patients involved in the charges. He had no special expertise in prosthetics and had not been employed previously by the Board. He evaluated the denture work and reported in writing to the Board. His reports as to each patient were entered into evidence at the hearing. He testified for the first time as an expert at the hearing.

On Monday, January 8, 1979, Esther D. was in Dr. James' office for an extraction of a wisdom tooth. The extraction was performed by Dr. Blanchard. Esther D. called the office several times during the next few days complaining of pain. She received a telephonic prescription for pain medication. The medication did not relieve the pain. On Thursday she called again and was told by the receptionist that no appointments could be made until Monday and that if she could not wait she should go to another doctor or hospital. That day she went to another dentist who treated her for pain from a "dry socket" (painful exposure of bone, not uncommon, after extraction). Dr. James, who had no personal contact with Esther D., testified he did not know of the case or handle any aspect of it. He said if his staff rebuffed the patient, it was contrary to his established procedures. The ALJ nevertheless concluded the actions constituted patient abandonment.

Having received a complaint, the Board contacted Dr. James about Esther D.'s case. He wrote that she had a tooth removed on January 8, 1979, and was seen again on January 15, 1979, when she requested a refill of her pain medication. He claimed she called two days later and requested another refill. She was asked to return for another examination before another refill was ordered. She never returned. Dr. James testified that this letter resulted from inquiries made of office personnel. The contents of the letter, though not incongruent with, were unsupported by, entries in the patient's file. However, the ALJ found the letter constituted a material misrepresentation of facts to the Board.

Daniel T. had been a patient of Dr. James' since 1978. In 1980, Daniel T.'s remaining teeth were extracted and full dentures were made. Several adjustments by various dentists at Dr. James' offices failed to correct the patient's problems. The dentures were overextended and impinged upon muscles in the mouth, causing dislodgment. Just prior to the administrative

hearing, Daniel T. returned to Dr. James' office for further adjustments. The ALJ found the malfitting dentures established incompetence.

Early in 1980, Pearl O. visited Dr. James' office. Full lower dentures were made without significant complaint. In May 1980, after extracting the remaining upper teeth, full upper dentures were fabricated. The patient had tori (bony growths) which prevented a comfortable fit of the dentures. Dr. James testified the patient initially rejected removal of the tori, noted in the patient's file as early as February. Pearl O. testified she never refused to have them removed. In July, the patient had the tori removed and a new lower denture was made. Pearl O. repeatedly returned to the office for adjustments. She was seen by every dentist at the offices, including Dr. James. In February 1981, Dr. James spoke with her and told her nothing else could be done. He did not refund her money.

Subsequently, she was seen by a Dr. Rice at Dr. Campbell's dental office in Modesto. After almost two years and five dentures later, Dr. Rice terminated her, offering to refund her money. At the time of trial, Pearl O. was under the care of Dr. Filburn, who was in private practice and who had fabricated her initial lower dentures while working for Dr. James.

Even so, the ALJ found the dentures made by Dr. James' office were overextended and had poor occlusion, establishing incompetence on the part of Dr. James.

On the above three patients, Dr. James personally performed no, or minimal, professional services. His liability for the acts was predicated upon the finding by the court that the other dentists working in his office were his employees, rather than independent contractors, and his personal license to practice dentistry was therefore put in jeopardy.

In June 1981, Dr. James made a full upper denture for Patsy A. after extracting her remaining upper teeth. Dr. James also made a partial lower denture. The patient returned to the office five times for adjustments. The dentures were overextended, had poor occlusion and the denture midline deviated two millimeters from the facial midline. The ALJ found the problems exhibited negligence in the practice of dentistry.

Finally, Suzanne V. visited Dr. James in March 1981. She was a Denti-Cal patient. Dr. James recommended and requested a new full upper denture and an acrylic partial lower denture. Denti-Cal approved the lower denture, but not the upper. There was a question whether an acrylic lower denture could be adjusted to fit the patient's mouth because of an unusually high muscle attachment of the tongue. She returned for three adjustments. The

denture was overextended and would dislodge with lateral pressure. The ALJ found the choice of an acrylic denture and subsequent failure to adjust the denture established negligence.

Based upon her factual findings of gross inefficiency, incompetence and negligence, the ALJ concluded each constituted unprofessional conduct and ordered Dr. James' dental license revoked.

After additional briefing by the parties, the questions of substantial evidence supporting the above findings, including the nature of the relationship between the dentists and Dr. James, and the harshness of the penalty were submitted to the superior court on the administrative record in the mandamus proceedings. In its tentative decision, the superior court stated:

"The court finds that the evidence supports the findings that the petitioner fell below the standard of practice in the treatment of four individuals and unprofessional conduct towards a fifth, and a deliberate attempt to cover up the unprofessional conduct.

"The court cannot say that in light of all of the above, and in view of Government Code § 11522 that there has been a manifest abuse of discretion in the revocation of petitioner's license." While the tentative decision seems to reflect only a review of the evidence for sufficiency, the court, in the judgment, recited that the material was reviewed under the independent judgment standard.

I

*Burden of Proof and Standard of Review*

■ The burden of proof in the administrative proceedings involving the revocation or suspension of a professional license is clear and convincing proof to a reasonable certainty. (*Ettinger* v. *Board of Medical Quality Assurance* (1982) 135 Cal.App.3d 853, 856 [185 Cal.Rptr. 601].) The ALJ recognized the existence of this correct standard.

■ In reviewing an administrative decision involving a vested right such as a professional license, the superior court applies the independent judgment rule. (*Bixby* v. *Pierno* (1971) 4 Cal.3d 130, 143 [93 Cal.Rptr. 234, 481 P.2d 242].) The trial court examines the administrative record for errors of law and reweighs the evidence in a limited trial de novo. (*Ibid.*, see especially fn. 10.) This judicial reweighing requires that a preponderance of the evidence support the administrative disposition. (Code Civ. Proc., § 1094.5, subd. (c).)

 Finally, the appellate court reviews the record to determine whether the trial court's findings are supported by substantial evidence. (*Bixby* v. *Pierno, supra,* at p. 143, fn. 10.) " 'The reviewing court must consider the entire record . . . and may not isolate only the evidence which supports the board's findings [citation] and thus disregard relevant evidence in the record. [Citation.]' " (*Steve P. Rados, Inc.* v. *California Occupational Saf. & Health Appeals Bd.* (1979) 89 Cal.App.3d 590, 595 [152 Cal.Rptr. 510]; see Fellmeth & Folsom, Cal. Regulatory Law and Practice (1981) §§ 176, 177, pp. 154-155; Barkett & Snyder, Cal. Administrative Mandamus (Cont.Ed.Bar Supp. 1984) pp. 182-183.) Where the trial court has exercised its independent judgment, our review for substantial evidence focuses upon the findings made by the trial court, not the administrative agency. (Fellmeth & Folsom, Cal. Regulatory Law and Practice, *supra,* at p. 155.)

No findings were filed by the trial court. Although Dr. James requested a statement of decision, he did not make the request on the day of the hearing. The court held Dr. James' request untimely. Dr. James, in his appellate brief, does not challenge this ruling.

On appeal, we normally presume the trial court made all findings necessary to support the judgment. (*Milligan* v. *Hearing Aid Dispensers Examining Com.* (1983) 142 Cal.App.3d 1002, 1004-1005, fn. 3 [191 Cal.Rptr. 490]; *Small* v. *Smith* (1971) 16 Cal.App.3d 450, 455 [94 Cal.Rptr. 136].) However, the judgment here recites only that the court applied the independent judgment rule and denied the petition, nothing more.

If we look to the trial court's tentative decision (see *Birkenfeld* v. *City of Berkeley* (1976) 17 Cal.3d 129, 161 [130 Cal.Rptr. 465, 550 P.2d 1001]) to aid in implying findings, we note the trial court found evidence to support the findings of substandard care to four patients, unprofessional conduct toward a fifth, and a deliberate attempt to cover up the unprofessional conduct. Necessarily implied within this conclusion is the unsupported legal finding that because the other dentists working at Dr. James' offices were employees, Dr. James was liable for any inadequate care they provided. The court also found the revocation of license penalty not an abuse of discretion. However, except for the finding of unprofessional conduct, none of the trial court's *language* fits within the statutory scheme supporting revocation of a license.

Disciplinary actions for the suspension or revocation of dental licenses are conducted in accordance with "Chapter 5 (commencing with Section 11500) of Part 1 of Division 3 of Title 2 of the Government Code, . . ."

(Bus. & Prof. Code, § 1670.)¹ Government Code section 11518 requires in part that: "The decision shall be in writing and shall contain findings of fact, a determination of the issues presented and the penalty, if any." As the court in *Swars* v. *Council of City of Vallejo* (1949) 33 Cal.2d 867, 871 [206 P.2d 355], explained: "The basic purposes of findings are to aid the court in determining whether there is sufficient evidence to support them [citation]; to enable the court to examine the decision of the administrative agency in order to determine whether it is based upon a proper principle [citation]; and to apprise the litigants or parties in regard to the reason for the administrative action as an aid to them in deciding whether additional proceedings should be initiated and, if so, upon what grounds [citation]."

Here, because we have no statement of decision by the trial court, and its tentative decision is so nebulous that it is of no aid in our review of the record for the sufficiency of the evidence and the appropriateness of the penalty, we look necessarily to the decision of the ALJ for guidance.

The ALJ in her determination of issues unexplainedly found that gross inefficiency, incompetence and negligence all constituted unprofessional conduct.

Section 1670 provides in pertinent part: "Any licentiate may have his license revoked or suspended or be reprimanded or be placed on probation by the board for unprofessional conduct, or incompetence, or gross negligence, or repeated acts of negligence in his or her profession, . . ."

Section 1680 provides in part: "Unprofessional conduct by a person licensed under this chapter is defined as, but is not limited to, the violation of any one of the following:" and then lists 27 acts. The only sections which could be applicable to this case were: "(u) The abandonment of the patient by the licentiate before the completion of a phase of treatment, as that phase of treatment is defined by the customary practice and standards of the dental profession";² "(y) The aiding or abetting of a licensed dentist or dental auxiliary to practice dentistry in a negligent or incompetent manner." Incompetence, gross inefficiency and negligence are not listed as acts constituting unprofessional conduct. Consequently, the ALJ's determination of issues (finding five acts of unprofessional conduct) on its face is unsupported by the findings of fact.

In the case of Esther D., if we were to accept the ALJ's premise that Dr. James' license could be put in jeopardy based on the telephone practices of

---

¹All references are to the Business and Professions Code unless otherwise indicated.
²Subdivision (u) was amended in 1984.

his receptionist, or the acts of his colleague, Dr. Blanchard, unbeknown to Dr. James, some support would exist that Dr. James' conduct as described by the ALJ could amount to unprofessional conduct. In the findings, the ALJ concluded Dr. James' treatment was "an extreme departure from the accepted standard of care of dental practitioners and constitute[d] an abandonment of the patient." Abandonment is unprofessional conduct. (§ 1680, subd. (u).)

In the remaining four cases, any incompetence or negligence cannot be characterized as unprofessional conduct. First, section 1670 disjunctively lists unprofessional conduct, incompetence and negligence as separate and distinct grounds for disciplinary action.

■ "It is a cardinal rule of construction that, where possible, every clause and word of a statute should be given effect and meaning. [Citations.] It is equally true that in construing the component parts of a legislative act the courts should, where possible, give force and effect to each so that the whole act may have life and vitality. [Citations.]

"In order to give each word or phrase of the section effect and meaning and life and vitality we must conclude that the legislature intended to and did employ words and phrases in the sense, and with such a meaning, that each of the eleven stated grounds for removal refer to acts or omissions not necessarily included in the others. This is so because the section makes each separate ground of removal a sufficient cause for the discharge of a permanent teacher. A cause of action for removal is stated by charging an act or omission which falls within only one ground of removal. If the act charged falls within two or more grounds, the accusation could not charge a single offense, that is a single ground of removal, under one subdivision of the section. Further, the statute in question has as its object the termination of a valuable right of a permanent teacher, that of being continued in her employment. Such a statute should be strictly construed." (*Fresno City H.S. Dist.* v. *De Caristo* (1939) 33 Cal.App.2d 666, 672 [92 P.2d 668].) To telescope the meanings of unprofessional conduct, incompetence and negligence obviously violates the above rules of statutory construction.

■ Examining beyond the ALJ's characterization of the conduct, the findings of fact do not support a determination of unprofessional conduct. In the cases of Pearl O. and Daniel T. arguably the conduct may be encompassed in section 1680, subdivision (y): "aiding or abetting of a licensed dentist . . . to practice dentistry in a negligent or incompetent manner." However, no specific finding was made that Dr. James did anything to aid or abet the other dentists. Further, no case has defined what is meant by "aiding or abetting" as used in subdivision (y) of section 1680. In cases

involving aiding and abetting an unlicensed person to practice dentistry, aiding and abetting implies knowledge. (*Winning* v. *Board of Dental Examiners* (1931) 114 Cal.App. 658, 663 [300 P. 866].) We cannot imply a finding of "aiding and abetting" merely to sustain the ALJ's characterization of treatment of these two patients as unprofessional conduct. In the cases of Patsy A. and Suzanne V., Dr. James' conduct even arguably does not come within any of the acts listed in section 1680 as unprofessional conduct; at most, the conduct was simple negligence.

Because of the failure of the findings of fact to support the determination of the issues, we do not know if the Board revoked Dr. James' license for misconduct as revealed in the findings, or upon the misconception that his acts constituted unprofessional conduct. In *Franz* v. *Board of Medical Quality Assurance* (1982) 31 Cal.3d 124, 145 [181 Cal.Rptr. 732, 642 P.2d 792], the court stated: ■ "If an agency has imposed a single discipline for multiple charges, some of which are found not sustained by evidence, and if there is 'real doubt' whether the same action would have been taken on proper findings, the matter will be returned to the agency for redetermination of penalty." ■ Aside from the question of substantial evidence, "real doubt" exists as to whether the Board revoked Dr. James' license for five acts of unprofessional conduct, or for one act of unprofessional conduct, two acts of incompetence and two acts of simple negligence. The latter basis certainly does not support the harsh penalty imposed.

■ Incompetence generally is defined as a lack of knowledge or ability in the discharging of professional obligations. Often, incompetency results from a correctable fault or defect. (See *Fresno City H.S. Dist.* v. *De Caristo, supra,* 33 Cal.App.2d at p. 674.) ■ Thus, probation or suspension of Dr. James' license with training and examination requirements (see § 1671) would be a more appropriate penalty in a case of incompetence.

Section 1670 does not provide for disciplinary action for one act of simple negligence. Only "gross negligence or repeated acts of negligence" support a penalty. Where other acts are charged for which discipline may be imposed, it may not be inappropriate to charge negligence also. However, the two acts of simple negligence, by themselves, probably do not support any discipline or, at most, justify imposition of a probationary period.

Were we directly reviewing the decision of the ALJ, the failure of the findings of fact to support the determination of issues would necessitate reversal of the decision without further discussion. (See *Ruggiero* v. *Los Angeles City Unified Sch. Dist.* (1973) 33 Cal.App.3d 970, 973 [109 Cal.Rptr. 417].) But where the independent judgment of the superior court intervenes, we review the action of the superior court, not of the agency.

(Fellmeth & Folsom, Cal. Regulatory Law and Practice, *supra,* at p. 155.) Here, however, because of the lack of a statement of decision and the nebulousness of the tentative decision, the court's decision is ambiguous and unreviewable.

■ Furthermore, even if we had a complete statement of decision from the superior court finding one act of unprofessional conduct, two acts of incompetence and two acts of negligence, the matter would have to be returned to the Board for a redetermination of the appropriate penalty. The superior court reviews the penalty for abuse of discretion but may not substitute its discretion for that of the agency in the matter of form of discipline. (*American Funeral Concepts* v. *Board of Funeral Directors & Embalmers* (1982) 136 Cal.App.3d 303, 311 [186 Cal.Rptr. 196]; Code Civ. Proc., § 1094.5, subd. (f).)

In *American Funeral Concepts,* the court faced a similar problem. The board's findings did not support the determination that the licensee had violated the pertinent statute. (136 Cal.App.3d at pp. 308-310.) The trial court sought to cure the deficiency by making its own findings. The appellate court held the trial court was precluded "from cutting and pasting its premise upon an agency determination founded on a different premise. The agency decision to discipline Summers and the choice of the discipline may have been influenced by the erroneous finding." (*Id.,* at p. 311.) Here, the trial court is in no better position than we are to determine whether the Board looked to the findings of fact to support the penalty, or based the penalty upon the erroneous determination that all the acts constituted unprofessional conduct. Without more, clearly, the case must be reversed and the court directed to issue a writ requiring the Board to reconsider; any penalty imposed may be based only upon those findings supported by substantial evidence.

## II

### Failure of Evidence to
### Support the Factual Findings

We find insufficient evidence to support at least some of the findings. ■ An important factor in our review is that any attack to revoke the personal license to practice dentistry of Dr. James of course must be based upon findings of his own acts of misfeasance, or on such acts by those working with him of which he had personal knowledge and which he actually ratified. (See § 1680, subd. (y).)

The labeling of someone as an employee and imputing the employee's misconduct to the employer may be appropriate in civil claims by the victim

of misconduct, but does not support a finding of personal dereliction to justify such sanctions as the revocation of a personal license to practice dentistry. Evidence of the negligence of Dr. Blanchard or others cannot be used unfairly against Dr. James. (See *Franz* v. *Board of Medical Quality Assurance, supra,* 31 Cal.3d 124, 144.)

As a factual matter, Dr. James cannot suffer the loss of his license for acts of alleged gross negligence where it " 'was not established that [Dr. James] knew, or should have known, that there was an unreasonable risk that [another doctor] was grossly incompetent or that there was an unreasonable risk that [another doctor] would be guilty of grossly negligent acts or omissions . . . .' " (*Franz* v. *Board of Medical Quality Assurance, supra,* at p. 144; see also *Yale* v. *The State Bar* (1940) 16 Cal.2d 175, 176 [105 P.2d 112]; *In re Luce, McDonald, & Torrance* (1890) 83 Cal. 303, 305 [23 P. 350].)

Any unprofessional conduct of Dr. James is to be based on Dr. James' own acts and omissions in the treatment of his patients. (*Franz* v. *Board of Medical Quality Assurance, supra,* at p. 144.) Thus, in the cases of Esther D., Daniel T. and Pearl O., Dr. James may only be held accountable in these disciplinary processes for insufficiency in the care of patients which was the result of his own acts or acts of which he had knowledge and which he ratified.[3]

---

[3]Dr. Pack specifically testified that Dr. James was not consulted in the Daniel T. case and did not state he ever asked for "permission" in any actual case where permission was denied by Dr. James.

The patient files of Daniel T. and Pearl O. do not reveal that Dr. James had any general control over the work of the other dentists. For instance, in the case of Daniel T., in September 1980, Dr. Pack relined both the upper and lower dentures at no charge. There is no countersignature by Dr. James or any indication that he "approved" the course of action deemed appropriate by Dr. Pack. Again, in the case of Pearl O., a reline of the upper denture and remake of the lower denture was done without charge by Dr. Haworth in August 1980. This, in spite of the fact that Dr. James one month earlier had seen the patient, done a free reline of the full upper denture and noted "will not do again without a charge." Another free reline was done in September 1980 by Dr. Russ.

Finally, the evidence does not support fully the findings that with Daniel T. and Pearl O., Dr. James ratified the treatment of the other dentists and unilaterally terminated the treatment of both. Dr. James saw Daniel T. in October 1980, took impressions for relines and noted the patient was making loud, derogatory remarks to the receptionist. The patient returned for one adjustment on the lower denture. On his last visit in December 1980, Dr. James saw the patient and told him there would be a charge for further relines but did not "unilaterally terminate" the patient.

On Pearl O.'s final visit she was referred to Dr. James. She insisted on new, free dentures or a refund. Dr. James told her he could do nothing more to help her. This action supports the finding that she was unilaterally terminated by Dr. James. It does not support the inference of ratification. Dr. James did not examine Pearl O.'s dentures at the last visit. His termination was based not on the fact that the dentures fit, or did not fit, but rather that Pearl O. had three sets of dentures made, numerous relines and innumerable adjustments, none of which satisfied the patient. His decision more nearly was a recognition of the true problem.

The three cases cited by the Board where a licensing agency disciplined licentiates for the acts of their employees are distinguishable and do not apply here.

In *Camacho* v. *Youde* (1979) 95 Cal.App.3d 161 [157 Cal.Rptr. 26], the court held that the holder of an agricultural pest control license was disciplined appropriately for the negligent spraying of a field by his employee, who was a licensed pilot. Both the employer and employee were disciplined. The case is a far cry from the present matter. Here, the doctors in the office suffered no discipline, and under review was not a license to operate a dental clinic or a hospital, but a license allowing the personal practice of dentistry by Dr. James, the same personal license held by each of the doctors in the office.

In *Arenstein* v. *California State Bd. of Pharmacy* (1968) 265 Cal.App.2d 179 [71 Cal.Rptr. 357], the court held a licensed corporate pharmacy could be disciplined for the illegal acts of its employee-pharmacists. The president of the corporation, a pharmacist, and his employee both sold dangerous drugs and were subject to discipline. Here again, the improper activity was "done in the course of his business in the operation of the license," not in the personal practice of medicine, dentistry or law under a professional license.

Finally, in *Randle* v. *Cal. State Bd. of Pharmacy* (1966) 240 Cal.App.2d 254 [49 Cal.Rptr. 485], the court held that a wife, holder of a permit to operate a pharmacy, could be disciplined for the acts of her pharmacist husband. Both were disciplined by the board when the husband, unbeknown to the wife, sold drugs without a prescription. The wife held a permit to operate a pharmacy which is totally distinguishable from the present situation.

We find no California or out-of-state cases dealing with doctors or dentists where discipline was imposed upon a licensee for acts of another in the same profession based upon principles of vicarious liability or respondeat superior. In the legal profession, an attorney is not subject to discipline for the acts of his partner. (*Yale* v. *The State Bar, supra,* 16 Cal.2d 175, 176; *In re Luce, McDonald, & Torrance, supra,* 83 Cal. 303, 305.)

 In the case of Esther D., the ALJ found evidence to support abandonment of the patient, but no definition of abandonment was offered by the ALJ or by the parties. Dr. Arena in his testimony concluded Dr. James' conduct amounted to "factual abandonment" of the patient. On appeal, Dr. James argues "abandonment implies a total and irrevocable termination of a relationship with a patient," but cites no authority for the definition. We

find no case law in California defining abandonment in this context. In an annotation entitled "Liability of Physician Who Abandons Case," abandonment is defined as "the unilateral severance by the physician of the professional relationship between himself and the patient without reasonable notice at a time when there is still the necessity of continuing attention.

". . . . . . . . . . . . . . . . . . . . ."

"Similarly, cases where the physician shows a lack of diligence in attending a patient by failing to respond to a call or by failing to visit the patient when such visits were required are not within the scope of this annotation so long as it appears that the physician intended to continue the relationship. Since the distinction depends basically on the mental state of the physician, the line is rather obscure between cases where the physician has definitely abandoned the patient by completely severing the relationship of physician and patient, and cases where the physician, while temporarily negligent in attending the patient, intends to continue such relationship." (Annot. (1958) 57 A.L.R.2d 432, 435-436, fn. omitted.) Under the above ALR definition, Dr. James' point is well-taken. The evidence shows only that Dr. James' staff negligently failed to make an immediate appointment for Esther D., and offered to make arrangements for her to be seen the following Monday.

 In addition, in the findings of fact, the ALJ concludes the failure to treat Esther D. constituted "an extreme departure from the accepted standards of care of dental practitioners" using the standard definition of gross negligence. (*Franz* v. *Board of Medical Quality Assurance, supra,* 31 Cal.3d 124, 138.) In the determination of issues, the ALJ found "James was grossly inefficient in his care of patient Esther D. . . . ." No case in California defines gross inefficiency in this context. Ballentine's Law Dictionary (3d ed. 1969), page 617, defines inefficiency as incompetency. The ALR annotation cited in Ballentine's, in the context of teachers, states: "The cases would seem to indicate that the terms 'incompetency' and 'inefficiency' are closely allied, if not synonymous, and that both terms connote a lack of some requisite ability, . . ." (Annot. (1965) 4 A.L.R.3d 1090, 1095.) This definition of inefficiency indicates another breakdown between the findings of fact and determination of issues.

 Also, the findings of fact of the ALJ include the statement that the letter regarding Esther D. written by Dr. James to the Board was a material misrepresentation. However, neither the accusation nor the first supplemental accusation charged Dr. James with misrepresentation or even mentioned the letter. For such a letter to comprise grounds for discipline, it should have been made a part of the accusation giving the licensee notice of the

charges against him. (See *Bley* v. *Board of Dental Examiners* (1932) 120 Cal.App. 426, 430-431 [7 P.2d 1053].) Further, in the determination of issues the ALJ makes no mention of the letter.

In the cases of Daniel T. and Pearl O., Dr. James' loss of his license was based on the professional aptitudes of his dental colleagues. In the findings relative to Daniel T., the ALJ concluded his dentures were "grossly overextended." While Dr. Arena in his report on Daniel T. characterized the overextensions as gross, when pressed at the hearing as to the degree of overextension in Patsy A.'s case, he stated:

"A That is subjective. They were overextended to the degree that when the patient moved her muscular denture, that denture would dislodge.

"Whether it is gross extension or not, it is irrelevant. It is to the degree it didn't work.

"Q In your evaluation, was it simply an overextension, or was it an over gross [*sic*] extension?

"A Again, it would be—we are talking about nebulous terminology. To me, it was an overextension. Either one to me—they are both the same thing.

"I guess it would be the easiest way for me to say that. When you say gross, you have to give me a definition what you mean by gross overextension. Either one, if it doesn't work, it doesn't work." We question whether Dr. Arena based his evaluation upon objective medical standards; his use of the term "gross," in his own words was part of a "nebulous terminology," "irrelevant" and "subjective." Also, the ALJ found: "The borders of the dentures were substantially over extended, impinging approximately two *centimeters.*" (Italics added.) The testimony of Dr. Arena reveals the overextension was two *millimeters.*

In the case of Pearl O., the ALJ concluded that the failure to remove the tori before fabricating any dentures constituted a departure from accepted standards of dentistry. However, the testimony and report of Dr. Arena, at most, support a finding of incompetence, not negligence. Additionally, the ALJ notes that the first lower denture constructed for Pearl O. was without significant problems. Yet, this denture was made and worn before removal of the lower tori.

Further, the record as a whole suggests initially Pearl O. rejected having the tori removed. Pearl O. testified she did not refuse to have the tori re-

moved. Dr. James testified that at least twice he recommended removal of the tori and she opposed the procedure. In a contest of credibility, we defer to the factfinder; however, the patient's chart supports Dr. James' claims.

The major problem with the findings as to both Daniel T. and Pearl O. is the characterization of the misconduct as "incompetence." We are not informed by findings or by argument of counsel why the problems with fitting dentures on Daniel T. and Pearl O. are termed incompetency, but the problems concerning Patsy A. and Suzanne V. are deemed negligence.[4]

The treatment of Pearl O. and Daniel T. was characterized differently from the treatment of Patsy A. and Suzanne V. without explanation. Daniel T. and Pearl O. returned to Dr. James' offices a substantial number of times for adjustments (approximately 20 and 50 visits, respectively). Patsy A. and Suzanne V. returned five and three times, respectively.

In the case of Patsy A., the ALJ found the full upper denture and partial lower dentures as fabricated and adjusted established negligence. While it is clear the dentures displayed a number of problems, the ALJ did not take into account that the patient simply stopped coming to Dr. James' office within a few months of the fabrication. Dr. Arena, on cross-examination, testified that normally a person receiving dentures returns three to five times within a six-month period for adjustments. He also noted that "a dentist should be given opportunity to correct the problem."

Patsy A. had five adjustments within the first month and a reline of the upper dentures two and one-half months later. Dr. Arena testified that the gums atrophy in denture patients.

"A The gum tissue is constantly changing in all denture patients. It does the predominant in the beginning. As time goes on, there is less change.

"Q But I take it the great dynamics takes [*sic*] place in the beginning stages?

"A I would feel in [*sic*] within the first year." This testimony suggests that the failure of the dentures to fit at the time Dr. Arena examined Patsy A. (approximately 14 months after the dentures were first installed) may have been the result of changes in the patient's gum structure. Dr. James was given no opportunity to adjust for these changes in the gums as the patient never returned.

---

[4]The superior court must have been puzzled by this discrepancy for, rather than choosing either term, stated, "Petitioner fell below the standard of practice" in four cases.

In the case of Suzanne V., the ALJ found: "Because of the large surface area necessary for structural stability in acrylic dentures and because of the dictates of the patient's anatomy, the dentures should have been fabricated out of chrome cobalt rather than acrylic. Respondent did not properly fabricate or fit the denture for the patient, and his fabrication and adjustment establishes [sic] negligence in the practice of dentistry." This conclusion is contradictory. Chrome cobalt rather than acrylic should have been used, said Dr. Arena, because acrylic could not successfully be adjusted to fit the unusual structure of the patient's mouth. We question if Dr. James should be held responsible for both failing to use the appropriate material and failing to adjust adequately the improper material whose impropriety flowed from the fact it could not be adjusted.

Also, Dr. James testified the acrylic plate possibly could be adjusted by insertion of a wire or metal bar to reinforce the acrylic denture after allowance for the patient's mouth structure. Dr. Arena acknowledged this might work. Such testimony indicates the fabrication in acrylic, while perhaps not preferable, was at least an acceptable choice.[5]

If Dr. James' negligence flowed from his failure to adjust Suzanne V.'s denture, the same problem arises that occurred with Patsy A. Suzanne V. received a denture on June 24, 1981. She returned the next day for an adjustment and returned again on July 2 and August 11 for adjustments. She did not return again. Dr. James had no opportunity thereafter to correct any defect in the fit of her denture.

With Esther D., Dr. James did not abandon the patient; with Daniel T. and Pearl O., we question both the finding of inadequacy of care and Dr. James' ratification; with Patsy A. and Suzanne V., the failure of the patients to return for adjustment deprived Dr. James of the opportunity to rectify the problems with the dentures.

We reverse the judgment. The superior court is ordered to issue the writ of mandamus and to remand the matter to the Board to redetermine what penalty, if any, other than revocation of license, is appropriate in light of our discussion.

---

[5]Suzanne V. was a Denti-Cal patient and Dr. James testified that Denti-Cal was strapped for funds during this period and was not approving the more expensive cast dentures. This is why he requested an acrylic denture. This testimony was not contradicted at the hearing. It was also brought out that before Denti-Cal approved any treatment, the patient was examined by another dentist who evaluates the request of the patient's dentist. The Denti-Cal consultant had the authority to change a request. If, as suggested by Dr. Arena, the necessity of using a cast denture was obvious by examination of the patient, why did not the Denti-Cal consultant order cast dentures if acrylic dentures were obviously inadequate?

The judgment is reversed.

Franson, Acting P. J., and Hamlin, J., concurred.

A petition for a rehearing was denied October 30, 1985, and respondent's petition for review by the Supreme Court was denied December 18, 1985.